[Cite as *State v. Gipson*, 2009-Ohio-6234.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## HANCOCK COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,               CASE NO.  5-09-19

    v.

JIMMY LEE GIPSON,               O P I N I O N

    DEFENDANT-APPELLANT.

---

**Appeal from Hancock County Common Pleas Court**
**Trial Court No. 2008-CR-204**

**Judgment Affirmed**

**Date of Decision:  November 30, 2009**

---

**APPEARANCES:**

    *Michael B. Kelley*  for Appellant

    *Mark C. Miller*  for Appellee

Case No. 5-09-19

**SHAW, J.**

{¶1} The defendant-appellant, Jimmy Lee Gipson, appeals the May 12, 2009 judgment of the Common Pleas Court of Hancock County, Ohio, finding him guilty of one count of illegal assembly or possession of chemicals for the manufacture of drugs and sentencing him to seven years in prison.

{¶2} The facts relevant to this appeal are as follows. On September 3, 2008, Detective Jason Seem and Detective Michael Swope of the Hancock County Drug Task Force/METRICH Enforcement Unit ("the task force") met with John Fenstermaker to discuss his knowledge of a methamphetamine ("meth") lab that was being operated in McComb, Ohio. Fenstermaker was referred to these officers by Chief Greg Smith of the McComb Police Department. In exchange for this information, the officers agreed not to pursue misdemeanor charges against Fenstermaker, who had been found in possession of a marijuana plant by the McComb police.

{¶3} Fenstermaker revealed that Gipson was manufacturing and selling meth from the home he shared with his girlfriend, Melissa Chapman, at 116 North Street in McComb. He further stated that Gipson made the meth in his garage and would sell it from his house, as well as his mother's house at 111 North Todd Street in McComb. He also informed them that he had personally observed Gipson make meth in the garage and described what he could recall of the

manufacturing process for the officers. In addition, Fenstermaker told the officers the names of various individuals who purchased pseudoephedrine for Gipson at locations in the surrounding area.[1]

{¶4} Based on this information, the officers drove to 116 North Street in McComb. They saw a car parked in front of the house, and a check of the license plate showed that it was registered to Melissa Chapman. They also checked the criminal history of Gipson and found that the task force made two controlled buys of meth from Gipson in 2003. Gipson was later convicted of two counts of aggravated trafficking in drugs, one a felony of the second degree and the other a felony of the fourth degree.

{¶5} Members of the task force also went to a number of pharmacies in Findlay, Ohio, to check the pseudoephedrine purchase logs.[2] In several of these logs, they discovered the names of some of the people Fenstermaker had given them as providing pseudoephedrine for Gipson. Some of these individuals bought pseudoephedrine multiple times on the same day at different pharmacies. They also noticed that there was another pseudoephedrine purchaser with the same last name as those provided by Fenstermaker and found that some license numbers

---

[1] Pseudoephedrine is a key ingredient in the manufacture of meth.

[2] The federal government has placed limits on the amount of pseudoephedrine that may be purchased by an individual at any one time and how often a person may purchase pseudoephedrine in a month. In addition, while a person does not need a prescription to purchase pseudoephedrine, he/she must produce a driver's license or state identification card in order to purchase pseudoephedrine. Also, pharmacies are required to keep pseudoephedrine behind the counter and to maintain a log of all pseudoephedrine purchases and by whom they were made, including the license number of the purchaser.

given by certain purchasers from McComb were not actual license numbers or were numbers assigned to other people. The officers also found Gipson's name in many of these logs. Gipson's listed address in these logs was 116 North Street, McComb, Ohio. The last of the purchases made by one of the people named by Fenstermaker occurred on August 28, 2008.

{¶6} On September 4, 2008, the officers performed surveillance on Gipson's home from 7:00 p.m. to 8:30 p.m. During this time, they witnessed a large number of people at the home and saw many individuals coming and going from the home. At some point, they saw a person known by them to be involved in illegal drugs.

{¶7} The following day, Detective Seem obtained a search warrant for Gipson's home. This warrant contained a provision that the warrant could be executed in the daytime or nighttime. On September 7, 2008, at 4:43 a.m., the task force, along with the clandestine laboratory suppression unit of the Ohio Bureau of Criminal Identification and Investigation ("BCI"), executed the warrant. Upon entering the home, Gipson, Chapman, Aretta Young, and three young children were found, the adults were secured, and all six people were taken to a designated area for decontamination. The home's air quality was then checked by two officers with special training in hazards associated with the operation of a

meth lab. These officers wore protective gear and breathing equipment while they examined the home for safety purposes.

{¶8} Once the quality of the air was checked and the decision made that protective gear and breathing equipment were no longer needed to safely be in the home, a number of officers began searching the home. Several items used in the manufacture of meth were found in the home, including lithium batteries, pseudoephedrine tablets, lye, punched starter fluid cans, grinders with white residue inside them, and a funnel with white residue inside it. They also found a pipe in one of the bedrooms and two pipes in the attached garage that contained meth residue in them. In the backyard, they located a fire ring with lithium batteries and the remains of a number of blister packs of pseudoephedrine pills in the ashes.

{¶9} The officers also found a sealed black trash bag inside a garbage can next to the garage. Upon opening the bag, a strong odor of ammonia was detected, prompting the officers to re-dress in their protective gear. Found inside the bag were latex gloves, filters, lithium metal strips from batteries, plastic bottles with anhydrous cook in them, and an acid gas generator that was still off-gassing (emitting smoke from the top of a plastic bottle due to the chemical reaction of the acid and salt inside the bottle). Although he denied knowledge or ownership of

the black trash bag and its contents and denied manufacturing meth, Gipson admitted to the officers that many of the questioned items found were his.

{¶10} Gipson was arrested and later indicted for one count of illegal assembly or possession of chemicals for the manufacture of drugs, specifically methamphetamine. The trial in this matter was held from March 30-April 1, 2009. The State presented the testimony of several officers, Fenstermaker, and Melissa Chapman and presented various exhibits, including a video recording of the contents of the black trash bag that depicted the gas generator off-gassing. The defense then presented the testimony of a number of witnesses, including Gipson. Thereafter, the jury returned a verdict of guilty, and the trial court ordered a pre-sentence investigation. On May 7, 2009, the trial court sentenced Gipson to seven years in prison. This appeal followed, and Gipson now asserts three assignments of error.

## ASSIGNMENT OF ERROR I

**THE TRIAL COURT ERRED BY FAILING TO FIND THAT THE SEARCH WARRANT PERTAINING TO GIPSON'S RESIDENCE LACKED PROBABLE CAUSE, AND BY FAILING TO FIND THAT THE SUBSEQUENT SEARCH, SEIZURE UNCONSTITUTIONAL, AND RESULTING TESTIMONY AND EVIDENCE PRESENTED AT TRIAL INADMISSIBLE PURSUANT TO THE FOURTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND ARTICLE 1, SECTION 14 OF THE OHIO CONSTITUTION.**

**ASSIGNMENT OF ERROR II**

**THE TRIAL COURT VIOLATED GIPSON'S RIGHT TO DUE PROCESS UNDER THE FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND ARTICLE 1, SECTION 10 OF THE OHIO CONSTITUTION WHEN IT UPHELD THE JURY VERDICT AS IT WAS NOT SUPPORTED BY THE SUFFICIENCY OF THE EVIDENCE AND WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.**

**ASSIGNMENT OF ERROR III**

**GIPSON WAS DENIED HIS CONSTITUTIONAL RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL UNDER THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE 1, SECTIONS 10 AND 16 OF THE OHIO CONSTITUTION.**

**{¶11}** Initially, this Court notes that the crux of each of Gipson's three assignments of error involves the search of Gipson's home. Therefore, we elect to address them together.

**{¶12}** More specifically, Gipson asserts that the warrant to search his home was issued without probable cause. In addition, he maintains that the execution of the warrant was performed in the nighttime without a sufficient basis and in violation of the "knock-and-announce" rule. Thus, he contends that the evidence found in his home, upon which the State's case was based, should have been suppressed. Absent this evidence, Gipson asserts, there was insufficient evidence to find him guilty and, consequently, the verdict of guilty was against the manifest weight of the evidence. However, Gipson's trial counsel failed to move to

suppress this evidence. As such, he has waived all but plain error as to this issue. See *State v. Jones*, 91 Ohio St.3d 335, 346, 744 N.E.2d 1163, 2001-Ohio-57; *State v. Gordon* (1971), 28 Ohio St.2d 45, 276 N.E.2d 243; *Holman v. Grandview Hosp. & Med. Ctr.* (1987), 37 Ohio App.3d 151, 157, 524 N.E.2d 903.

{¶13} In order to find plain error, there must be a deviation from a legal rule, the error must be an "obvious" defect in the trial proceedings, and the error must affect a defendant's "substantial rights." *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240, 2002-Ohio-68. Reversal on plain error is to be used "with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage" of justice. *Id.* Because of the failure by his trial counsel to move to suppress the evidence obtained from the search of Gipson's home and this Court's inability to reverse this judgment absent plain error, Gipson also asserts that his trial counsel was ineffective for failing to raise this issue.

{¶14} Our review of these issues begins by noting that attorneys licensed by the State of Ohio are presumed to provide competent representation. *State v. Hoffman* (1998), 129 Ohio App.3d 403, 407, 717 N.E.2d 1149. An ineffective assistance of counsel claim requires proof that trial counsel's performance fell below objective standards of reasonable representation and that the defendant was prejudiced as a result. *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph two of the syllabus. As to the first prong of the test, courts are to

afford a high level of deference to the performance of trial counsel. *Bradley*, 42 Ohio St.3d at 142, 538 N.E.2d 373. To show that a defendant has been prejudiced by counsel's deficient performance, the defendant must prove that there exists a reasonable probability that, but for counsel's errors, the outcome at trial would have been different. *Id*. at paragraph three of the syllabus. "Reasonable probability" is a probability sufficient to undermine confidence in the outcome of the trial. *Id*. at 142.

{¶15} The United States Supreme Court has held that the "failure to file a suppression motion does not constitute per se ineffective assistance of counsel." *Kimmelman v. Morrison* (1986), 477 U.S. 365, 384, 106 S.Ct. 2574, cited in *State v. Madrigal*, 87 Ohio St.3d 378, 389, 721 N.E.2d 52, 2000-Ohio-448. There must also be a reasonable probability that the motion will be successful. See *State v. Robinson* (1996), 108 Ohio App.3d 428, 433, 670 N.E.2d 1077; *State v. Ligon* , 3rd Dist. No. 4-2000-25, 2001-Ohio-2231. Thus, this Court's determination of whether counsel for Gipson was ineffective relies upon whether there was a reasonable probability that a motion to suppress in this case would have been successful.

{¶16} The Ohio Supreme Court has previously held that

**[i]n determining the sufficiency of probable cause in an affidavit submitted in support of a search warrant, "[t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the**

> **affidavit before him * * * there is a fair probability that contraband or evidence of a crime will be found in a particular place."**

*State v. George* (1989), 45 Ohio St.3d 325, 544 N.E.2d 640, paragraph one of the syllabus, quoting *Illinois v. Gates* (1983), 462 U.S. 213, 238-239, 103 S.Ct. 2317. In *Gates*, the Court stated that the definition of probable cause "'means less than evidence which would justify condemnation * * *. It imports a seizure made under circumstances which warrant suspicion.'" *Gates*, 462 U.S. at 235, quoting *Locke v. United States* (1813), 11 U.S. (7 Cranch) 339, 348, 3 L.Ed. 364. Thus, "[f]inely-tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence, useful in formal trial, have no place in the magistrate's decision. * * * it is clear that 'only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause.'" *Gates*, 462 U.S. at 235, quoting *Spinelli v. United States* (1969), 393 U.S. 410, 419, 89 S.Ct. 584, abrogated by *Gates*, supra.

{¶17} When reviewing a magistrate's or judge's determination of probable cause justifying the issuance of a search warrant under the totality-of-the-circumstances analysis of *Gates*, an appellate court must simply "ensure that the magistrate had a substantial basis for concluding that probable cause existed." *George*, 45 Ohio St.3d at paragraph two of the syllabus. In fact, often a particular case may not be easy to determine when an affidavit demonstrates the existence of

probable cause. Accordingly, the issuing judge or magistrate is to be accorded great deference, "and doubtful or marginal cases in this area should be resolved in favor of upholding the warrant." *Id*., citing *Gates*, supra.

{¶18} Here, Gipson contends that the affidavit in support of the warrant did not establish probable cause because there was no indication that Fenstermaker, the confidential informant providing the information that meth was being produced in the home, was reliable. In addition, he asserts that the police failed to corroborate the information provided to them by Fenstermaker.

{¶19} "[W]ith regard to confidential or anonymous informants, their veracity, reliability and basis of knowledge are all highly relevant in determining probable cause, so '[t]here must be some basis in the affidavit to indicate the informant's credibility, honesty or reliability.'" *State v. Pustelnik*, 8th Dist. No. 91779, 2009-Ohio-3458, at ¶ 22, quoting *State v. Harry*, 12th Dist. No. CA2008-01-013, 2008-Ohio-6380 (internal citations omitted). However, a failure of the affiant to attest to the informant's veracity or reliability based on past experience "does not negate probable cause if there is * * * some other indicia of reliability." *Pustelnik*, supra, citing *Gates*, supra. Thus, an identified informant who provides corroborated information may establish probable cause. See *State v. Martin*, 8th Dist. No. 89030, 2007-Ohio-6062.

{¶20} In this case, Fenstermaker personally witnessed Gipson manufacturing meth in his North Street home, specifically in the garage at the rear of the home. However, Fenstermaker was unknown to the task force officers to whom he divulged this information concerning the meth production in Gipson's home. Therefore, Det. Seem, the affiant, could not attest to Fenstermaker's veracity. Instead, he and other officers elected to conduct further investigation into Fenstermaker's assertions.

{¶21} In this investigation, they went to nine different pharmacies in the Findlay area to examine each store's pseudoephedrine logs. In these logs, they discovered the names of some of the people that Fenstermaker provided to them, such as Casey Brumbaugh and Paul Parker. Fenstermaker had also given them the names Joe and Nick Zamora. Although neither one of their names were found, an individual by the name of Jose (the last name was illegible) made a pseudoephedrine purchase in April of 2008. Jose listed 116 North Street, McComb, Ohio, as his address but the license number was false. Further, the name Janie Zamora was found four times, two of which occurred on September 2, 2008.[3] Another individual, Aretta Young, made a purchase on March 24, 2008, and listed her address as 116 North Street, McComb, Ohio.[4] The officers also found seven different purchases of multiple packs of pseudoephedrine by Gipson,

---

[3] At trial, Gipson testified that Janie Zamora is his sister and is married to Nick Zamora.
[4] On the day of the search, Aretta Young was found inside the home. She is Gipson's maternal grandmother.

himself, from March 29, 2008, until August 14, 2008. In these logs, Gipson listed his address as 116 North Street, McComb, Ohio.

{¶22} The officers also checked Gipson's criminal history, which included two counts of aggravated trafficking in drugs, specifically meth. They also checked the plate number of the vehicle they saw parked in front of the North Street home. This vehicle was registered to Melissa Chapman, who Fenstermaker said lived there with Gipson. They also conducted surveillance on the home and noticed a large number of people at the home and many people coming and going from the home. One of these people was Darrin Wright, a man known to the detectives as being involved in illegal narcotics. In addition, Fenstermaker informed the officers that Gipson would also sell meth from his mother's home at 111 North Todd Street in McComb, Ohio. On August 20, 2008, only two weeks before Fenstermaker came forward with his information, the task force conducted a controlled buy of both marijuana and meth from David McDill and his unknown supplier at 111 North Todd Street in McComb.

{¶23} All of this information corroborated Fenstermaker's allegations. Additionally, Fenstermaker was not an anonymous tipster. He spoke in person with the detectives and much of his information was independently corroborated. Thus, this corroboration demonstrates the reliability of Fenstermaker's statements. In light of the totality of the circumstances presented to the issuing judge, the

judge had a substantial basis for concluding that probable cause existed to issue the warrant.

{¶24} However, our inquiry does not end upon concluding that the warrant was based upon probable cause. Gipson further contends that the evidence seized during the search should be suppressed because the trial court had no basis for permitting the execution of the warrant during the nighttime and because the officers who executed the warrant did so in violation of the "knock-and-announce" rule.

{¶25} The Fourth Amendment to the United States Constitution requires law enforcement officers to execute search warrants in a reasonable manner. The Fourth Amendment protects "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." In determining whether law enforcement officers executed a search warrant in a reasonable manner, one aspect that courts must consider is the procedure in which the search warrant was executed. The United States Supreme Court has interpreted the Fourth Amendment to incorporate the common-law principle of "knock-and-announce" prior to entering a residence. *Wilson v. Arkansas* (1995), 514 U.S. 927, 115 S.Ct. 1914. The Court held that whether law enforcement officers properly complied with the knock-and-announce procedures forms part of the reasonableness inquiry under the Fourth Amendment. *Id*.

{¶26} Ohio's General Assembly has codified the "knock-and-announce" rule. See R.C. 2935.12(A). This statute permits an officer who is executing an arrest warrant or a search warrant to "break down an outer or inner door or window of a dwelling house or other building, if, after notice of his intention to make the arrest or to execute the warrant or summons, he is refused admittance[.]"[5] Id. There are also other exigent circumstances that permit nonconsensual entry into a person's home, such as the "hot pursuit" exception. See *State v. Stuber*, 150 Ohio App.3d 200, 779 N.E.2d 1090, 2002-Ohio-6309, at ¶ 9, citing *Payton v. New York* (1980), 445 U.S. 573, 100 S.Ct. 1371. Such intrusions will not render a search unreasonable to warrant the application of the exclusionary rule.

{¶27} Recently, the United States Supreme Court had the opportunity to once again address the "knock-and-announce" rule in determining whether the exclusionary rule is an appropriate sanction for a violation of the knock-and-announce requirement. See *Hudson v. Michigan* (2006), 547 U.S. 586, 126 S.Ct. 2159. In making its determination, the Court reiterated its previous holdings that the exclusionary rule is "a last resort, not a first impulse" and was created to "vindicate" the citizen's right to shield their persons, houses, papers, and effects

---

[5] This section also permits the "knock-and-announce" rule to be waived in accordance with R.C. 2933.231, which requires the search warrant affidavit to include certain averments. However, no such averments were made in the search warrant currently at issue. Thus, R.C. 2933.231 is inapplicable here.

"from the government's scrutiny" absent a warrant. *Id*. at 592-593. The Court further recognized that the "knock-and-announce" rule was created for the "protection of human life and limb," the protection of property, and the protection of "those elements of privacy and dignity that can be destroyed by a sudden entrance[.]" However, it also noted that the "rule has never protected * * * one's interest in preventing the government from seeing or taking evidence described in a warrant." *Id*. at 594. Thus, the Court determined that a violation of the "knock-and-announce" rule does not necessarily warrant the suppression of all evidence obtained pursuant to a valid warrant. *Id*.

{¶28} The Ohio Supreme Court adopted the holding of *Hudson* eight months later in *State v. Oliver*, 112 Ohio St.3d 447, 860 N.E.2d 1002, 2007-Ohio-372. In *Oliver*, the Court held that before employing the exclusionary rule as a sanction for a "knock-and-announce" violation, a court must consider the toll of suppressing evidence and implement the exclusionary rule "only in cases where its power to deter police misconduct outweighs its costs to the public." *Id*.

{¶29} In this case, very little evidence was presented at trial as to the manner and mode of entry in the execution of the search warrant. In fact, the only evidence presented on this issue was the testimony of Det. Seem, who testified as follows:

> **What my role in the entry I believe I was the third or fourth person into the residence. As we made entry into, it was a knock**

> **and announce search warrant which basically means we knocked on the door, loudly yelled police, sheriff's office, announced our presence, waited for someone to come to the door. Nobody came to the door and we were able to see a white male take off running through the residence towards the back. At that point, for our safety, we forced entry into the room.**

(Trial Trans. p. 303.)  Based on this testimony, Gipson contends that the "knock-and-announce" rule was violated by the officers' failure to announce their purpose, i.e. execution of a search warrant, and to wait a sufficient amount of time prior to entering.

{¶30} Clearly, at the jury trial in this matter the State was not focused on developing Det. Seem's testimony, or any other witness' testimony, as to the actual manner and mode of entry as this was not a suppression hearing and the prosecutor had no notice that the search was being challenged on this basis.  Thus, this Court's ability to adequately analyze whether the search warrant was properly executed in this regard is hampered by a lack of knowledge of exactly what was said by the officers who were knocking, the length of time between knocking and announcing and then forcing entry, and how they actually executed their entry.  However, it does appear that the officers knocked on the door, announced who they were, and did not force entry into the home until they saw an adult male running to the back of the home.  According to the affidavit, the garage was located in the back of the home and was where the meth was being produced.  The man could have been attempting to destroy evidence or attempting to access a

-17-

weapon. Further, the evidence possibly being destroyed was highly dangerous and the improper handling of this evidence could have placed everyone's safety in jeopardy. Therefore, forced entry seems to be justified in this case.

{¶31} Nevertheless, even assuming *arguendo*, that the officers violated the "knock-and-announce" rule, we do not find that this failure warrants the application of the exclusionary rule. To the contrary, the officers were investigating a possible meth lab in which various chemicals and the fumes therefrom created hazards to all those inside the home and in close proximity to the home. Thus, closing this lab and properly disposing of any harmful chemicals was vitally important for the safety of the public, as well as Gipson's children. As such, the deterrent effect for any alleged police misconduct in this case, which appears to have been minimal, by no means outweighs the costs to the public if we were to apply the exclusionary rule in this case. Therefore, the exclusionary rule is an inappropriate sanction for the alleged violation of the "knock-and-announce" rule in this case.

{¶32} As to the issue of the nighttime warrant, the Revised Code states: "The command of the warrant shall be that the search be made in the daytime, unless there is urgent necessity for a search in the night, in which case a search in the night may be ordered." R.C. 2933.24(A). Additionally, Crim.R. 41(C) provides in pertinent part that "[t]he warrant shall be served in the daytime, unless

the issuing court, by appropriate provision in the warrant, and for reasonable cause shown, authorizes its execution at times other than daytime." The term "daytime" is used in this rule to mean the hours from 7:00 a.m. to 8:00 p.m. Crim.R. 41(F).

**{¶33}** An issuing judge's decision to authorize a nighttime search will not be disturbed absent a showing by the complaining party that the judge abused his discretion. *State v. Eichhorn* (1975), 47 Ohio App.2d 227, 353 N.E.2d 861; *State v. Marko* (1973), 36 Ohio App.2d 114, 303 N.E.2d 94. In order to find an abuse of discretion, "the result must be so palpably and grossly violative of fact or logic that it evidences not the exercise of will but the perversity of will, not the exercise of judgment but the defiance of judgment, not the exercise of reason but instead passion or bias." *Nakoff v. Fairview Gen. Hosp.*, 75 Ohio St.3d 254, 256, 662 N.E.2d 1, 1996-Ohio-159.

**{¶34}** In this case, the affidavit contained a provision that stated: "Request for Nighttime Search. Affiant further states that a search in the nighttime (the hours between 8:00 P.M. and 7:00 A.M.) is warranted and requested, due to the following facts:" No facts followed that statement, only the concluding signature of Detective Seem and the notarization by the issuing judge. Nevertheless, the warrant contained a provision commanding law enforcement "to enter, in the daytime, or in the nighttime, into the residence . . ." Thus, the issuing judge permitted a nighttime search.

{¶35} Although the affidavit neglected to specify what facts warranted a nighttime search, a review of the affidavit in its entirety reveals a number of relevant facts. For instance, the affidavit contained information about the people who frequented Gipson's home. At least two of these individuals had violent histories and had "approach with caution" entries in their computerized criminal histories. One of these individuals also had prior offenses for resisting arrest and obstructing official business. Further, Gipson, himself, was a convicted felon for trafficking in drugs. The officers also noted several people coming and going from the home and a large number of people were present after 8:00 p.m. when the home was under surveillance. Moreover, the offense being currently investigated was the operation of a meth lab. As previously noted, manufacturing meth creates a highly dangerous situation. In addition, the Ohio Supreme Court, as well as many other courts, has noted that an illegal drug transaction in today's society "reasonably warrants the conclusion that a suspected dealer may be armed and dangerous." *State v. Evans*, 67 Ohio St.3d 405, 413, 618 N.E.2d 162, 1993-Ohio-186; see also, *State v. Dickerson*, 179 Ohio App.3d 754, 758, 903 N.E.2d 697, 2008-Ohio-6544.

{¶36} Given these circumstances, we cannot find that the trial court abused its discretion in determining that the affidavit contained sufficient information to demonstrate that night entry into Gipson's home was necessary. Allowing a

nighttime search in this case afforded protection to the officers executing the warrant, as well as the occupants of the home and those in close proximity, because of the dangers attendant with the operation of a meth lab and the background of those who lived in and frequented the home. Thus, the issuing judge did not err in authorizing a nighttime search.

{¶37} Even assuming *arguendo* that a nighttime search was not warranted, we do not find this failure warrants the application of the exclusionary rule, for the same reasons we previously provided in our discussion as to the application of the exclusionary rule with "knock-and-announce" violations.

{¶38} For all of the foregoing reasons, no reasonable probability exists that the motion to suppress would have been successful. In light of this determination, trial counsel's decision not to file a motion to suppress did not constitute ineffective assistance of counsel, and the first and third assignments of error are overruled.

{¶39} As for the assignment of error challenging the sufficiency and manifest weight of the evidence, Gipson's argument rests upon the exclusion of the evidence seized during the search of his home. Without this evidence, he asserts, the evidence was insufficient as to the sole count of the indictment and the verdict of guilty was against the manifest weight of the evidence. He *does not* assert that the evidence was insufficient and that the verdict of guilty was against

the manifest weight of the evidence when considering the evidence found in his home. Given our decision that the evidence from the search should not have been suppressed and was properly admitted into evidence, Gipson's second assignment of error is rendered moot and, accordingly, is overruled.

{¶40} For these reasons, the judgment of the Common Pleas Court of Hancock County, Ohio, is affirmed.

*Judgment Affirmed*

**PRESTON, P.J., and ROGERS, J., concur.**

**/jlr**