[Cite as *State v. Craw*, 2018-Ohio-1769.]

IN THE COURT OF APPEALS OF OHIO
THIRD APPELLATE DISTRICT
MERCER COUNTY


STATE OF OHIO,

     PLAINTIFF-APPELLEE,                 CASE NO. 10-17-09

     v.

RICHARD C. CRAW,                   O P I N I O N

     DEFENDANT-APPELLANT.


Appeal from Mercer County Common Pleas Court
Trial Court No. 14-CRM-139

Judgment Affirmed

Date of Decision:   May 7, 2018


APPEARANCES:

    *Michael J. Short* **for Appellant**

    *Matthew K. Fox and Joshua A. Muhlenkamp* **for Appellee**

**PRESTON, J.**

{**¶1**} Defendant-appellant, Richard C. Craw ("Craw"), appeals the September 5, 2017 judgment entry of sentence of the Mercer County Court of Common Pleas. He argues that the trial court erred in denying his motions to suppress. For the reasons that follow, we affirm.

{**¶2**} This case stems from the execution of a search warrant issued, in part, for a travel trailer owned by Craw following an investigation of Craw's ties to and involvement in the production of methamphetamine. The search warrant, executed on September 18, 2014, yielded physical evidence of methamphetamine possession and manufacturing. On October 17, 2014, the Mercer County Grand Jury indicted Craw on three counts: Count One of illegal manufacture of drugs in violation of R.C. 2925.04(A), (C)(3)(a), a second-degree felony; Count Two of illegal assembly or possession of chemicals for the manufacture of drugs in violation of R.C. 2925.041(A), (C), a third-degree felony; and Count Three of aggravated possession of drugs in violation of R.C. 2925.11(A), (C)(1)(e), a first-degree felony, with a major drug offender specification under R.C. 2941.1410(A). (Doc. No. 5). Craw initially pleaded not guilty to the charges and the specification on October 27, 2014. (*See* Doc. No. 27). (*See also* Oct. 27, 2014 Tr. at 4).

{**¶3**} On June 29, 2015, Craw filed a motion to suppress the physical evidence seized under the search warrant as well as the statements he made to law

enforcement officers during the execution of the search warrant. (Doc. No. 71). Craw argued that the search warrant was not supported by probable cause and did not specify the places to be searched and the items to be seized with sufficient particularity. (*Id.*). Craw sought to suppress his statements on grounds that the statements were made before he was informed of his *Miranda* rights. (*Id.*).

{¶4} After an August 28, 2015 hearing, the trial court denied Craw's motion to suppress evidence on October 15, 2015. (Doc. No. 87).

{¶5} On January 19, 2016, Craw, through his attorney, filed a motion requesting that the trial court reconsider its judgment denying Craw's motion to suppress evidence and issue findings of fact and conclusions of law. (Doc. No. 113). On February 25, 2016, Craw, pro se, filed a separate motion for reconsideration. (Doc. No. 122).

{¶6} On September 12, 2016, the State filed a memorandum in opposition to the motions for reconsideration. (Doc. No. 161). On September 22, 2016, Craw, pro se, filed his response to the State's memorandum in opposition to the motions for reconsideration. (Doc. No. 168).[1]

{¶7} On December 2, 2016, the trial court denied Craw's motions for reconsideration. (Doc. Nos. 188, 194).

---

[1] Craw was represented by counsel until September 2016. Craw eventually executed a waiver of counsel form on September 14, 2016 and represented himself until a change of plea hearing in July 2017. (*See* Doc. Nos. 163, 340). At that time, Craw's standby counsel resumed his representation of Craw.

{¶8} On July 3, 2017, Craw filed a motion with the trial court which the trial court treated as a renewed motion to suppress evidence. (Doc. No. 324). The trial court denied Craw's renewed motion later that day, adopting the entirety of its October 15, 2015 judgment entry. (Doc. No. 326).

{¶9} On July 27, 2017, pursuant to a negotiated plea agreement, Craw entered no contest pleas to Counts One and Two. (Doc. No. 340). The trial court convicted Craw of those two charges and dismissed Count Three and the specification. (Doc. No. 346).

{¶10} On September 5, 2017, the trial court sentenced Craw to four years' incarceration on count one and 36 months' incarceration on Count Two for an aggregate term of seven years' imprisonment. (Doc. No. 361).

{¶11} On September 12, 2017, Craw filed a notice of appeal. (Doc. No. 376). He raises three assignments of error, which we address together.

**Assignment of Error No. I**

**The search warrant was not supported by probable cause.**

**Assignment of Error No. II**

**The search warrant was overbroad.**

**Assignment of Error No. III**

**The Defendant's statements were made without the required *Miranda* warnings.**

{¶12} Each of Craw's three assignments of error maintains that the trial court erred in denying his motions to suppress. Accordingly, this court will assess each of Craw's assignments of error under the same standard of review.

{¶13} A review of the denial of a motion to suppress involves mixed questions of law and fact. *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, ¶ 8. At a suppression hearing, the trial court assumes the role of trier of fact and, as such, is in the best position to evaluate the evidence and the credibility of witnesses. *Id. See also State v. Carter*, 72 Ohio St.3d 545, 552 (1995). When reviewing a ruling on a motion to suppress, "an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence." *Burnside* at ¶ 8, citing *State v. Fanning*, 1 Ohio St.3d 19 (1982). With respect to the trial court's conclusions of law, however, our standard of review is de novo, and we must independently determine whether the facts satisfy the applicable legal standard. *Id.*, citing *State v. McNamara*, 124 Ohio App.3d 706 (4th Dist.1997).

{¶14} In his first assignment of error, Craw argues that the trial court erred in denying his motions to suppress because the search warrant is not supported by probable cause. Specifically, Craw argues that the information set forth in the affidavit relied on by the issuing authority in granting the search warrant is not sufficient to support a finding of probable cause.

{¶15} The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers,
> and effects, against unreasonable searches and seizures, shall not be
> violated, and no Warrants shall issue, but upon probable cause,
> supported by Oath or affirmation, and particularly describing the
> place to be searched, and the persons or things to be seized.

The probable-cause requirement is "[c]entral to the Fourth Amendment." *State v. Castagnola*, 145 Ohio St.3d 1, 2015-Ohio-1565, ¶ 34. "A neutral and detached judge or magistrate may issue a search warrant only upon the finding of probable cause." *State v. Young*, 146 Ohio App.3d 245, 253-254 (11th Dist.2001), citing *United States v. Leon*, 468 U.S. 897, 916 (1984). "Probable cause 'means less than evidence which would justify condemnation,' so that only the 'probability, and not a prima facie showing of criminal activity is the standard of probable cause.'" *State v. Gonzales*, 3d Dist. Seneca Nos. 13-13-31 and 13-13-32, 2014-Ohio-557, ¶ 18, quoting *State v. George*, 45 Ohio St.3d 325, 329 (1989).

> In determining the sufficiency of probable cause in an affidavit
> submitted in support of a search warrant, "[t]he task of the issuing
> [authority] is simply to make a practical, common-sense decision
> whether, given all the circumstances set forth in the affidavit before
> him, including the 'veracity' and 'basis of knowledge' of persons

supplying hearsay information, there is a fair probability that
contraband or evidence of a crime will be found in a particular place."

*George* at paragraph one of the syllabus, quoting *Illinois v. Gates*, 462 U.S. 213, 238-239 (1983). In other words, the issuing authority must examine the "totality-of-the-circumstances" in determining whether probable cause exists to issue a search warrant. *Id.* at 329, citing *Gates* at 238-239.

**{¶16}** "When reviewing the sufficiency of an affidavit in support of a search warrant, both the trial court and the appellate court are limited to the information that was 'brought to the attention of the [issuing authority].'" *State v. Garza*, 3d Dist. Henry No. 7-13-04, 2013-Ohio-5492, ¶ 10, quoting *State v. Graddy*, 55 Ohio St.2d 132, 134 (1978), fn. 1. Frequently, "the reviewing court is bound by the 'four corners' of the affidavit, as that is often the only record available before it." *Id.*, citing *State v. OK Sun Bean*, 13 Ohio App.3d 69, 71 (6th Dist.1983). In reviewing an issuing authority's determination of probable cause, an appellate court's duty is not to "conduct[] a de novo determination as to whether the affidavit contains sufficient probable cause upon which that court would issue the search warrant" but rather to "ensure that the [issuing authority] had a substantial basis for concluding that probable cause existed." *George* at paragraph two of the syllabus, citing *Gates*. "In conducting any after-the-fact scrutiny of an affidavit submitted in support of a search warrant, trial and appellate courts should accord great deference to the

[issuing authority's] determination of probable cause, and doubtful or marginal cases in this area should be resolved in favor of upholding the warrant." *Id.*, citing *Gates*.

**{¶17}** In this case, the issuing authority had a substantial basis for concluding that probable cause existed to issue the search warrant. Investigator John Barker ("Barker") of the Grand Lake Task Force swore to the affidavit supporting the search-warrant application. (*See* State's Ex. 1). In the affidavit, Barker stated that he had conducted intermittent surveillance on Craw for approximately three months prior to September 18, 2014. (*Id.* at 2). Barker further noted in the affidavit that during this period of surveillance, he routinely observed that Craw was visited at his residence by several individuals who regularly appeared on the Ohio Pharmacy Board's "Meth Check" system—a database that tracks purchases of pseudoephedrine, a substance commonly used to manufacture methamphetamine. (*Id.*). Additionally, Barker indicated in the affidavit that when he searched the "Meth Check" system, Craw was shown as having purchased pseudoephedrine approximately every 10 to 14 days throughout 2014. (*Id.*). In the affidavit, Barker also averred that he received a report from a manager at a Menards home improvement store in Celina, Ohio to the effect that Craw had been purchasing large amounts of lye, a substance required for the production of methamphetamine. (*Id.*). Barker stated that, in early August 2014, he identified Craw in security camera video

footage that the Menards manager had indicated was associated with the large lye purchases. (*Id.*).

{¶18} Further, Barker stated that on September 18, 2014, a confidential informant told him that Craw had assembled the necessary ingredients for the manufacture of methamphetamine and that Craw would be "cooking" methamphetamine in a camper west of Celina, Ohio that same evening. (*Id.* at 2-3). Barker noted that the confidential informant was a person known to him who had previously provided reliable, independently corroborated information. (*Id.* at 2).

{¶19} In the affidavit, Barker averred that, from his period of surveillance on Craw, he knew that a vehicle operated by Craw was "frequently at [a] property located at 2521 Mud Pike [Road], Celina, Ohio." (*Id.* at 3). Barker further stated in the affidavit that, at 5:20 p.m. on September 18, 2014, he conducted surveillance at the Mud Pike property and saw a tan travel trailer with a brown stripe parked north of the residence. (*Id.*). Barker noted that he observed four to five people going to and from the tan travel trailer. (*Id.*). Barker averred that a box fan was positioned in the open door to the travel trailer and that the ambient temperature at the time he observed the box fan was approximately 70 degrees Fahrenheit. (*Id.*). Barker stated that from his training and experience, it is common to ventilate a methamphetamine "cook" because of the toxicity of the fumes. (*Id.*).

{¶20} We find that, based on the totality of the circumstances detailed in Barker's affidavit, the issuing authority had a substantial basis to conclude that probable cause existed to issue the search warrant and that evidence of methamphetamine possession, methamphetamine manufacturing, and illegal assembly of materials used to manufacture methamphetamine would likely be discovered in Craw's travel trailer.

{¶21} On the day that Barker applied for the search warrant, he received information from an identifiable, reliable confidential informant that Craw had amassed the materials necessary to manufacture methamphetamine and that he would be "cooking" methamphetamine in a trailer west of Celina that evening. *See State v. Young*, 12th Dist. Clermont No. CA2005-08-074, 2006-Ohio-1784, ¶ 25. Barker's earlier surveillance and investigation of Craw and his associates served to corroborate much of the informant's tip. From his investigation, Barker learned that Craw habitually purchased pseudoephedrine. *See State v. Kithcart*, 5th Dist. Ashland No. 12-COA-048, 2013-Ohio-3022, ¶ 11; *State v. Gipson*, 3d Dist. Hancock No. 5-09-19, 2009-Ohio-6234, ¶ 21-23. Additionally, Barker discovered that Craw frequently associated with people who appeared on the "Meth Check" system. *See Young* at ¶ 24-25. Barker's investigation also revealed that Craw had acquired a large quantity of lye, another chemical used to produce methamphetamine. *See State v. Golubov*, 9th Dist. Wayne No. 05CA0019, 2005-

Ohio-4938, ¶ 15-22 (suggesting that information that Golubov had tried to purchase anhydrous ammonia, a chemical used to manufacture methamphetamine, could be properly considered in establishing probable cause to issue a search warrant).

{¶22} Furthermore, from his investigation, Barker knew that a vehicle operated by Craw was often parked at a property west of Celina. After Barker received the informant's tip, he drove to the property, where he observed multiple people moving in and out of the travel trailer. He also observed a box fan operating in the open door of the travel trailer and, based on his experience and training, he stated that the fan was consistent with the ventilation required for methamphetamine labs. *See State v. Ash*, 4th Dist. Pickaway No. 15CA1, 2015-Ohio-4974, ¶ 2, fn. 1 (noting that the use of a box fan for ventilation is consistent with the operation of a methamphetamine lab). In sum, based on the totality of the circumstances conveyed in the affidavit, we find that the issuing authority had a substantial basis for concluding that there was probable cause to issue a warrant to search the travel trailer.

{¶23} Craw's arguments to the contrary are unpersuasive. Craw argues that the affidavit was insufficient to support a finding that there was probable cause to search his trailer because Barker could not produce statements or video evidence from Menards to support his averment in the affidavit that he learned of Craw's lye purchases from a Menards manager. Craw also argues that the information

regarding the lye purchases could not support a finding of probable cause because the affidavit does not indicate when Barker received the information other than that it was "previously" provided to him. Finally, Craw argues that the mere fact that someone purchases cold medicine and associates with people who purchase cold medicine does not support a finding of probable cause. It may be true that any one of the averments to which Craw objects, taken in isolation, would not support a finding of probable cause. Ideally, Barker's affidavit would have laid out the dates and quantities of Craw's lye purchases with a greater degree of specificity, and Barker would have supplied the issuing authority with some documentary evidence corroborating the Menards manager's report concerning Craw's lye purchases. Craw is also correct that purchasing cold medicine and associating with people who purchase cold medicine are not inherently criminal. However, the existence of probable cause hinges on whether a consideration of a totality of the circumstances, taken together, leads to a conclusion by the issuing magistrate that there is a fair probability that contraband or evidence of a crime will be found in a particular place, not whether any one of those circumstances would independently support that conclusion. *See Young* at ¶ 26 ("'Probable cause is the sum total of layers of information * * *. We weigh not individual layers but the "laminated" total.'"), quoting *United States v. Nigro*, 727 F.2d 100, 104 (6th Cir.1984).

**{¶24}** In his second assignment of error, Craw argues that the trial court erred in denying his motions to suppress because the search warrant is overbroad. Specifically, Craw argues that the search warrant's reference to "materials used in the production of drugs, including, but not limited to, precursors as defined in Ohio Revised Code Section 3719.41" and the search warrant's failure to explicitly mention methamphetamine compel the conclusion that the search warrant does not satisfy the Fourth Amendment's particularity requirement.

**{¶25}** "Pursuant to the Fourth Amendment and Section 14, Article I, Ohio Constitution, only warrants 'particularly describing the place to be searched and the person or things to be seized' may issue." *Gonzales*, 2014-Ohio-557, at ¶ 30. "The manifest purpose of the Fourth Amendment's particularity requirement is to prevent general searches." *State v. Swing*, 12th Dist. Clermont No. CA2016-10-068, 2017-Ohio-8039, ¶ 40, citing *State v. Widmer*, 12th Dist. Warren No CA2011-03-027, 2012-Ohio-4342, ¶ 45, citing *Maryland v. Garrison*, 480 U.S. 79, 84 (1987). "By requiring a particular description of the items to be seized, the Fourth Amendment 'prevents the seizure of one thing under a warrant describing another. As to what is to be taken, nothing is left to the discretion of the officer executing the warrant.'" *Gonzales* at ¶ 30, quoting *Marron v. United States*, 275 U.S. 192, 196 (1927).

**{¶26}** "Particularization with respect to the things to be seized actually encompasses two distinct, albeit related, concerns: 'one is whether the

-13-

warrant supplies enough information to guide and control the agent's judgment in selecting what to take * * * and the other is whether the category as specified is too broad in the sense that it includes items that should not be seized.'" *Id.* at ¶ 31, quoting *United States v. Upham*, 168 F.3d 532, 535 (1st Cir.1999); *Castagnola*, 145 Ohio St.3d 1, 2015-Ohio-1565, at ¶ 79.

{¶27} "In determining whether a search warrant satisfies the Fourth Amendment's particularity requirement, reviewing courts employ a standard of practical accuracy rather than technical precision." *Gonzales* at ¶ 32, citing *United States v. Otero*, 563 F.3d 1127, 1132 (10th Cir.2009). "'[A] search warrant is not to be assessed in a hypertechnical manner [and need not satisfy the] "[t]echnical requirements of elaborate specificity once exacted under common law pleadings."'" *Id.*, quoting *United States v. Srivastava*, 540 F.3d 277, 289 (4th Cir.2008), quoting *United States v. Ventresca*, 380 U.S. 102, 108 (1965). A search warrant will be held sufficiently particular if it allows the executing officer to reasonably ascertain and identify the items that they are authorized to seize and distinguish those items from items that they may not seize. *Swing* at ¶ 40, citing *Widmer* at ¶ 45, citing *State v. McCroy*, 6th Dist. Wood Nos. WD-09-074 and WD-09-090, 2011-Ohio-546, ¶ 37 and *United States v. Blakeney*, 942 F.2d 1001, 1026 (6th Cir.1991); *Gonzales* at ¶ 32, quoting *United States v. Leary*, 846 F.2d 592, 600 (10th Cir.1988), fn. 12.

{¶28} In this case, the search warrant reads, in its relevant part, as follows:

From the affidavit sworn to before me, which is attached to the original of this Search Warrant, I find probable cause exists to issue this Warrant.

* * *

The property to be searched for and seized is described as follows: Drugs and drug paraphernalia, including, but not limited to materials used in the production of drugs, including but not limited to precursors as defined in Ohio Revised Code Section 3719.41, scales, monies, packaging materials, weapons used to protect drugs and money and any recording or monitoring devices used in the facilitation of drug transactions; any records indicating ownership of drugs and contraband items; any books, records, receipts, bank statements, etc. evidencing the obtaining, secreting, transfer or concealment of assets and/or the secreting, transfer, concealment or expenditure of money and the person of anyone found inside the premise to be searched.

(State's Ex. 1 at 6).

{¶29} On appeal, Craw contends that the search warrant does not comply with the Fourth Amendment because it gave searchers "carte blanche to search for anything related to every drug." (Appellant's Brief at 6). In particular, Craw contends that the search warrant's reference to "precursors as defined in Ohio

Revised Code Section 3719.41" fails the particularity requirement because "[R.C. 3719.41] defines all controlled substances." (*Id.*). Craw also argues that the warrant's description of the items to be seized is defective because the search warrant does not specifically authorize law enforcement officers to seize methamphetamine.

**{¶30}** "A search warrant that includes broad categories of items to be seized may nevertheless be valid when the description is "'"as specific as the circumstances and the nature of the activity under investigation permit.'"" *Castagnola*, 145 Ohio St.3d 1, 2015-Ohio-1565, at ¶ 80, quoting *Guest v. Leis*, 255 F.3d 325, 336 (6th Cir.2001), quoting *United States v. Henson*, 848 F.2d 1374, 1383 (6th Cir.1988), quoting *United States v. Blum*, 753 F.2d 999, 1001 (11th Cir.1985). Here, a fair reading of the search warrant discloses that the only items which law enforcement officers are authorized to seize are those that bear a connection to the crimes of drug possession and drug manufacturing. *See State v. Bangera*, 11th Dist. Geauga No. 2015-G-0021, 2016-Ohio-4596, ¶ 50 ("[A] search warrant containing a list of generic items likely to be found in the possession of a drug trafficker is not overbroad where the warrant limits the items to be seized to items that are related to the offenses of drug possession and drug trafficking."), citing *Gonzales*, 2014-Ohio-557, at ¶ 34 and *Young*, 2006-Ohio-1784, at ¶ 33. Thus, the search warrant is not fatally unparticular for failing to mention methamphetamine by name.

{¶31} Moreover, the warrant's reference to "precursors as defined in Ohio Revised Code Section 3719.41" does not make the search warrant unconstitutionally indefinite. Under R.C. 3719.41, "precursors" are a small and narrow class of substances: immediate precursors to amphetamine and methamphetamine and immediate precursors to phencyclidine (PCP). R.C. 3719.41, Schedule II (F)(1)-(2). Thus, contrary to Craw's assertion that the warrant's reference to R.C. 3719.41 does not impose a meaningful limitation on the items authorized to be seized, the warrant's use of the phrase "precursors as defined in Ohio Revised Code Section 3719.41" authorizes, at most, the seizure of the immediate precursors of only three controlled substances.

{¶32} Finally, construing the search warrant with the attached affidavit removes any lingering ambiguities as to the authorized scope of the search and seizure. We recognize that "[t]he Fourth Amendment by its terms requires particularity in the warrant, not in the supporting documents." *Groh v. Ramirez*, 540 U.S. 551, 557 (2004), citing *Massachusetts v. Sheppard*, 468 U.S. 981, 988 (1984), fn.5 and *United States v. Stefonek*, 179 F.3d 1030, 1033 (7th Cir.1999). However, warrants may satisfy the particularity requirement by being interpreted with reference to an affidavit incorporated into the warrant or physically attached thereto. *See United States v. Hurwitz*, 459 F.3d 463, 470-473 (4th Cir.2006); *Baranski v. Fifteen Unknown Agents of Bur. of Alcohol, Tobacco & Firearms*, 452

F.3d 433 (6th Cir.2006). *See also Groh* at 557-558. Here, the search warrant expressly references the affidavit used to support the application for the search warrant and states that the affidavit is attached to the warrant. (State's Ex. 1 at 6). The affidavit contains a list of the property to be searched for and seized identical to the list set forth in the warrant. (*Id.* at 1). The affidavit further states that the list of property to be searched for and seized "is involved with a violation of Ohio Revised Code Section 2925.11, 2924.04 and 2925.041."[2] (*Id.*). Finally, the affidavit repeatedly refers to methamphetamine and methamphetamine production. (*Id.* at 2-3).

{¶33} Construing the search warrant with the attached affidavit, it is clear that the search warrant sharply constrained the discretion of law enforcement officers and authorized them to search for and seize only those items that were related to violations of R.C. 2925.11, 2925.04, and 2925.041. *See Gonzales*, 2014-Ohio-557, at ¶ 33-34. Because the affidavit refers exclusively to methamphetamine and the manufacture of methamphetamine, it is clear that the "drugs," "drug paraphernalia," "materials used in the manufacture of drugs," and "precursors as defined in Ohio Revised Code Section 3719.41" refer specifically to

---

[2] R.C. 2925.11 and 2925.041 concern possession of controlled substances and illegal assembly or possession of chemicals for manufacture of drugs, respectively. The affidavit's recital of a possible violation of R.C. 2924.04, a nonexistent statutory provision, is likely a typographical error. R.C. 2925.04 concerns the illegal manufacture of drugs, a charge to which Craw ultimately pleaded no contest, and it is probable that the affiant intended to reference this provision.

methamphetamine, materials used to produce methamphetamine, precursors to methamphetamine, and other paraphernalia relating to the possession and manufacture of methamphetamine. Thus, the list of items to be searched for and seized is limited to items related to violations of R.C. 2925.11, 2925.04, and 2925.041, specifically possession and production of methamphetamine. As such, the search warrant is sufficiently particular. *See Gonzales* at ¶ 33-34; *Bangera*, 2016-Ohio-4596, at ¶ 51.

**{¶34}** In his third assignment of error, Craw argues that the trial court erred by denying his motions to suppress statements he made to police before he received *Miranda* warnings. In particular, Craw contends that the trial court incorrectly concluded that his pre-*Miranda* statements were admissible under the public-safety exception to the *Miranda* rule and that, as a result, the trial court erred in denying his motions to suppress the statements.

**{¶35}** "'The Fifth Amendment to the U.S. Constitution provides a privilege against self-incrimination.'" *State v. Pickens*, 3d Dist. Marion No. 9-16-35, 2017-Ohio-1231, ¶ 10, quoting *State v. Edmond*, 10th Dist. Franklin No. 15AP-574, 2016-Ohio-1034, ¶ 11. "'To protect this right, the United States Supreme Court has held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-

incrimination.""'" *Id.*, quoting *Edmond* at ¶ 11, quoting *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). "What are now commonly known as *Miranda* warnings are intended to protect a suspect from the coercive pressure present during a custodial interrogation." *Cleveland v. Oles*, 152 Ohio St.3d 1, 2017-Ohio-5834, ¶ 9, citing *Miranda* at 469. "A custodial interrogation is 'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.'" *Id.*, quoting *Miranda* at 444.

{¶36} The trial court denied Craw's motions to suppress evidence after concluding that, although Craw was in custody, the public-safety exception to the *Miranda* rule obviated the requirement that law enforcement officers provide Craw with *Miranda* warnings prior to initiating questioning. The trial court summarized the events surrounding Craw's statements, in relevant part, as follows:

> When [Detectives Doug Timmerman ("Timmerman") and Lance Crum] approached [Craw's travel trailer], they observed that the door was open. They identified themselves as officers of the Mercer County Sheriff's Department and ordered the individuals inside the trailer to vacate it. When two individuals came forth, the officers inquired if anyone else was left in the trailer because of their concern for their safety and anyone else who may have been in the trailer.

[Craw] advised them that two cooks were in process in the trailer. Detective Timmerman asked [Craw] if he needed to burp the operation, and [Craw] responded that that was necessary. Timmerman then notified the fire department. At no time did Detective Timmerman Mirandize the defendant, his focus being on the danger of the situation and his desire to protect the officers as well as [Craw].

[Detective Chad Fortkamp ("Fortkamp")] testified that he accompanied Detective Timmerman to the scene. * * * [Craw] advised Detective Fortkamp that an active cook was in process in response to Fortkamp stating he was going into the trailer. * * * [Detective Fortkamp] did not hear Timmerman advise [Craw] of his Miranda warnings.

(Doc. No. 87). Competent, credible evidence supports the trial court's factual findings regarding the events surrounding Craw's statements. *See State v. Thompson*, 7th Dist. Jefferson Nos. 98 JE 28 and 98 JE 29, 2001 WL 69197, *5-6 (Jan. 24, 2001).

**{¶37}** At the suppression hearing, Timmerman testified that he ordered Craw out of the trailer and that he posed questions to Craw. (Aug. 28, 2015 Tr. at 24). Timmerman asked "if there was anyone else in the trailer" to which Craw responded

that "there was not." (*Id.*). Timmerman then testified that he asked Craw whether there was "anyone else or anybody, or anything in the trailer that can hurt us." (*Id.*). According to Timmerman, Craw then informed him that two active cooks were in process, and he later answered that the cooks needed to be "burped."[3] (*Id.* at 24-25). Timmerman testified that he did not read Craw *Miranda* warnings. (*Id.*).

{¶38} When asked why he questioned Craw without advising him of his *Miranda* rights, Timmerman answered:

[Timmerman]: Well, first off, I wanted to make sure there was nobody else in the trailer for our safety. And then when he informed us that there was * * * two active cooks going on in there, [through] my training, [I've] been told that an active cook is very volatile and explosive. I certainly didn't want myself or Fortkamp, or even them, to get hurt, if that thing went off, so he was very forward with the amount of time that we had before that thing would, * * * because I specifically asked him if he needed to burp that lab, or to burp the bottle, and he said yes, and said two minutes. So that's when I yelled for Barry Niekamp, one of the Task

---

[3] "Burping" refers to the act of releasing pressurized gas that forms in a closed container during the process of manufacturing methamphetamine.

Force officers, to come over and immediately got the fire
department staged up on that.

(*Id.* at 25). On cross-examination, Timmerman reiterated that Craw informed him
that there were two active cooks after Timmerman asked whether there was "anyone
or anything in the trailer that's going to hurt us." (*Id.* at 28). On redirect
examination, Timmerman stressed that he was "concerned about the safety of that
lab." (*Id.* at 32). Timmerman testified that he felt that "[t]here is a safety issue for
myself * * * and everybody else who is out there yet. * * * I don't know if there is
another person in there, I don't know if there are weapons in there, I don't know if
the lab is going to blow up." (*Id.*).

{¶39} The State "concedes that Craw was in custody at the time of his
statements, that his statements were made in response to law enforcement
questioning, and that he was not read *Miranda* warnings prior to making several of
his statements." (Appellee's Brief at 10). Therefore, this court assumes without
deciding that Craw made the statements at issue in the context of a custodial
interrogation and without the benefit of *Miranda* warnings. As such, we turn to
whether Craw's statements are admissible notwithstanding the absence of *Miranda*
warnings.

{¶40} In denying Craw's motions to suppress his statements, the trial court
concluded that although Craw's incriminating statements were made in response to

"certain questions posed to him by law enforcement officers prior to * * * being advised of his constitutional rights" as required under *Miranda*, the officers' questions were asked with "regard to and for the purpose of securing the personal safety of the law enforcement officers as well as [Craw]." (Doc. No. 87).

{¶41} In *New York v. Quarles*, 467 U.S. 649 (1984), the United States Supreme Court announced an exception to the rule established in *Miranda* known as the public-safety exception. Under the public-safety exception, "when officers ask 'questions necessary to secure their own safety or the safety of the public' as opposed to 'questions designed solely to elicit testimonial evidence from a suspect,' they do not need to provide the warnings required by *Miranda*." *State v. Maxwell*, 139 Ohio St.3d 12, 2014-Ohio-1019, ¶ 113, quoting *Quarles* at 659. The public-safety exception is intended to avoid placing law enforcement officers in the

> untenable position of having to consider, often in a matter of seconds, whether it best serves society for them to ask the necessary questions without the *Miranda* warnings and render whatever probative evidence they uncover inadmissible, or for them to give the warnings in order to preserve the admissibility of evidence they might uncover but possibly damage or destroy their ability to obtain that evidence and neutralize the volatile situation confronting them.

*Quarles* at 657-658. It is a "narrow exception" in which the permissible scope of questioning is "circumscribed by the exigency which justifies it." *Id.* at 658.

**{¶42}** The public-safety exception is frequently invoked and applied in cases where a suspect who has not been read *Miranda* warnings is asked about the possession or location of a firearm or other weapon which could be used by a confederate of the suspect or found by a member of the public. *See, e.g.*, *id.* at 651-652; *Maxwell* at ¶110-111. However, the exception has also been applied by Ohio and federal appellate courts in circumstances in which the exigency that prompted questioning by law enforcement officers did not arise from a suspicion that a suspect was in possession or had recently come out of possession of a firearm or other weapon which could be wielded by someone else. *See, e.g.*, *State v. Strozier*, 172 Ohio App.3d 780, 2007-Ohio-4575, ¶ 27-28 (2d Dist.) (determining that the public-safety exception could apply to questions about whether a suspect was in possession of drug paraphernalia that could prick or otherwise injure police officers); *United States v. Mohammed*, 6th Cir. No. 10-4145, 2012 WL 4465626 (Sept. 28, 2012) (same); *State v. Thompson-Shabazz*, 2d Dist. Montgomery No. 27155, 2017-Ohio-7434, ¶ 37 (applying the public-safety exception to questions aimed at determining the whereabouts and physical condition of a person whose life was reasonably believed to be in danger); *State v. Santiago*, 9th Dist. Lorain No. 01CA007798, 2002 WL 388901, *3-4 (Mar. 13, 2002) (noting that the public-safety exception has been

extended to "situations where exigent circumstances may excuse compliance with *Miranda* when there is an overriding need to save human life or to rescue persons whose lives are in danger"). *But see State v. Ferrell*, 11th Dist. Portage No. 2017-P-0018, 2017-Ohio-9341, ¶ 45-46 (suggesting that the Supreme Court of Ohio's decision in *Maxwell* limits application of the public-safety exception only to circumstances where law enforcement officers have reason to believe that a suspect might have (or recently had) a weapon). In fact, at least one state supreme court has applied the public-safety exception to circumstances in which a law enforcement officer entered an apartment, detected a strong smell of ammonia, and asked the occupant whether there was an active methamphetamine lab in the apartment and what stage the lab was in. *State v. Simmons*, 714 N.W.2d 264, 274-275 (Iowa 2006).

**{¶43}** Here, law enforcement officers were serving a search warrant at the site of a suspected methamphetamine lab. The operation of a clandestine methamphetamine lab presents an exigent circumstance with a high risk of injury to the lab's operators, law enforcement officers, and the public at large. *See* R.C. 2933.33(A) ("[T]he risk of explosion or fire from the illegal manufacture of methamphetamine causing injury to the public constitutes exigent circumstances and reasonable grounds to believe that there is an immediate need to protect the lives, or property, of the officer and other individuals in the vicinity of the illegal manufacture."). While officers suspected that Craw was cooking methamphetamine

that evening, they had no way of knowing whether they would encounter a completed cook or whether they would encounter a cook in which volatile chemical reactions were still actively taking place. As such, it was necessary for law enforcement officers to establish the status of the lab as quickly as possible so as to secure their safety and the safety of the public, including Craw, from the threat of a potentially unstable and hazardous methamphetamine lab. *See United States v. Hodge*, 714 F.3d 380, 386-387 (6th Cir.2013) (noting that the public-safety exception can be applied in situations where law enforcement officers ask about bombs, in part, because "[b]ombs are potentially unstable and may cause damage if ignored or improperly handled by police"). Although Timmerman phrased his questions broadly, this does not defeat application of the public-safety exception because his questioning was prompted by a reasonable belief that officer and public safety was at risk. *See, e.g.*, *id.* at 387 (noting that Hodge's response to a question about whether there was "anything in the house that could get anyone there hurt" was admissible under the public-safety exception); *United States v. Williams*, 181 F.3d 945, 953-954 (8th Cir.1999) (noting that Williams's response to a question phrased "is there anything we need to be aware of?" was admissible under the public-safety exception). Accordingly, Craw's statements are admissible because the questions which prompted Craw's statements were necessary to secure the safety

of law enforcement officers and the public from the potentially dangerous conditions created by an active methamphetamine lab. *See Simmons* at 274-275.

{¶44} Therefore, we overrule Craw's first, second, and third assignments of error.

{¶45} Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**WILLAMOWSKI, P.J. and ZIMMERMAN, J., concur.**

**/jlr**