[Cite as *State v. Holmes*, 2019-Ohio-2485.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## ALLEN COUNTY

STATE OF OHIO,

     PLAINTIFF-APPELLEE,               CASE NO. 1-18-52

     v.

SHARON HOLMES,                     O P I N I O N

     DEFENDANT-APPELLANT.


**Appeal from Allen County Common Pleas Court**
**Trial Court No. CR2017 0226**

**Judgment Affirmed**

**Date of Decision: June 24, 2019**


**APPEARANCES:**

     *Kenneth J. Rexford* for Appellant

     *Jana E. Emerick* for Appellee

**PRESTON, J.**

{¶1} Defendant-appellant, Sharon Holmes ("Holmes"), appeals the September 7, 2018 judgment of sentence of the Allen County Court of Common Pleas. For the reasons that follow, we affirm.

{¶2} This case arises from a March 6, 2017 stop of Holmes's vehicle on Interstate 75 in Allen County, Ohio. (Mar. 21, 2018 Tr. at 18-19). On approaching Holmes's vehicle, the law enforcement officer who stopped the vehicle detected the odor of raw marijuana emanating from within the vehicle and proceeded to conduct a probable cause search for marijuana. (*Id.* at 19-20). During the search, law enforcement officers discovered a prescription pill bottle that contained a quantity of multicolored pills enclosed in a knotted plastic bag. (*Id.* at 28). The pills were seized and later identified as pentylone and methamphetamine. (Doc. No. 1).

{¶3} On July 13, 2017, Holmes was indicted on four counts: Counts One and Three of aggravated trafficking in drugs in violation of R.C. 2925.03(A)(2), (C)(1)(d), second-degree felonies, and Counts Two and Four of aggravated possession of drugs in violation of R.C. 2925.11(A), (C)(1)(c), second-degree felonies. (*Id.*). On December 20, 2017, Holmes appeared for arraignment and pleaded not guilty to the counts of the indictment. (Doc. No. 9).

{¶4} On January 5, 2018, Holmes filed a motion to suppress evidence. (Doc. No. 17). A hearing on Holmes's suppression motion was conducted on March 21,

2018. (Doc. No. 30). On March 27, 2018, Holmes filed her written closing arguments. (Doc. No. 32). On April 6, 2018, the State filed its written closing arguments. (Doc. No. 34). On April 9, 2018, Holmes filed her reply to the State's written closing arguments. (Doc. No. 35). On April 17, 2018, the trial court denied Holmes's motion to suppress evidence. (Doc. No. 38).

{¶5} On April 13, 2018, Holmes filed a motion to dismiss. (Doc. No. 36). On April 16, 2018, the trial court denied Holmes's motion to dismiss. (Doc. No. 37).

{¶6} On July 11, 2018, Holmes, under a negotiated plea agreement, withdrew her not guilty pleas and entered a plea of no contest to Count One of the indictment. (Doc. Nos. 47, 48). In exchange, the State agreed to recommend dismissal of Counts Two, Three, and Four of the indictment. (Doc. Nos. 47, 48). The trial court accepted Holmes's no contest plea, found her guilty, and ordered a presentence investigation. (Doc. No. 48). In addition, the trial court dismissed Counts Two, Three, and Four of the indictment. (*Id.*).

{¶7} On September 6, 2018, the trial court sentenced Holmes to five years in prison. (Doc. No. 52). The trial court filed its judgment entry of sentence on September 7, 2018. (*Id.*).

{¶8} On September 11, 2018, Holmes filed a notice of appeal. (Doc. No. 53). She raises four assignments of error for our review. We will begin by

addressing her first assignment of error. Then, we will consider her second and third assignments of error together. Finally, we will address her fourth assignment of error.

## Assignment of Error No. I

**The Trial Court should have dismissed the Indictment for insufficient number of jurors because Crim.R. 6(A) is unconstitutional, in violation of Article I, Section 10, of the Ohio Constitution and R.C. §2939.02.**

{¶9} In her first assignment of error, Holmes argues that the trial court erred by denying her motion to dismiss. Specifically, Holmes argues that the indictment against her should have been dismissed because the indictment "was (and remains) voidable for lack of a sufficient number of grand jurors." (Appellant's Brief at 7). As Holmes notes, the Ohio Constitution provides that the number of persons necessary to constitute a grand jury "shall be determined by law." (*Id.* at 8). She argues that this provision vests the Ohio General Assembly with exclusive authority to set the number of persons necessary to constitute a grand jury, and she notes that the General Assembly has, by statute, fixed this number at 15. (*Id.* at 7-9). Yet, she observes, Crim.R. 6(A), a rule prescribed by the Supreme Court of Ohio, provides that only 9 persons are necessary to constitute a grand jury. (*Id.* at 7). Holmes contends that this portion of Crim.R. 6(A) is unconstitutional because the Supreme Court of Ohio does not have authority under the Ohio Constitution to vary the number of grand jurors that the General Assembly has determined to be necessary

to constitute a grand jury. (*Id.* at 17). Thus, Holmes argues that because she was indicted by a grand jury consisting of 9 grand jurors rather than 15 grand jurors, the indictment should be voided and the case dismissed. (*Id.*).

{¶10} With respect to the right of indictment by grand jury, the Ohio Constitution provides in relevant part:

> [N]o person shall be held to answer for a capital, or otherwise infamous, crime, unless on presentment or indictment of a grand jury; and the number of persons necessary to constitute such grand jury and the number thereof necessary to concur in finding such indictment shall be determined by law.

Ohio Constitution, Article I, Section 10. The Ohio General Assembly has enacted two statutes dealing with the number of grand jurors necessary to comprise a grand jury and the number of grand jurors needed to concur in the decision to issue an indictment. First, R.C. 2939.02 provides that "[g]rand juries shall consist of fifteen persons who satisfy the qualifications of a juror specified in section 2313.17 of the Revised Code." Although R.C. 2939.02 was amended effective May 22, 2012, the amendment did not alter the number of grand jurors needed to constitute a grand jury, which has been fixed at 15 since at least 1984. *See* R.C. 2939.02 (Oct. 1, 1984). In addition, R.C. 2939.20 requires that "[a]t least twelve of the grand jurors

must concur in the finding of an indictment." R.C. 2939.20 has remained unchanged since its original enactment in 1953.

{¶11} In addition, the Ohio Constitution grants the Supreme Court of Ohio the power to make rules governing practice and procedure in the courts of this state:

> The supreme court shall prescribe rules governing practice and procedure in all courts of the state, which rules shall not abridge, enlarge, or modify any substantive right. * * * All laws in conflict with such rules shall be of no further force or effect after such rules have taken effect.

Ohio Constitution, Article IV, Section 5(B). Pursuant to this authority, the court promulgated Crim.R. 6, which in part provides that "[t]he grand jury shall consist of nine members, including the foreman, plus not more than five alternates." Crim.R. 6(A). Furthermore, Crim.R. 6(F) provides that "[a]n indictment may be found only upon the concurrence of seven or more jurors." Therefore, Crim.R. 6(A) and (F) are clearly in conflict with R.C. 2939.02 and 2939.20.

{¶12} The Supreme Court of Ohio has addressed the conflict between Crim.R. 6 and R.C. 2939.02 and 2939.20 on one previous occasion. In *State v. Brown*, the defendant argued that the indictment against her was defective in part because "the indictment was issued by a grand jury composed of nine people rather than the fifteen required by R.C. 2939.02." 38 Ohio St.3d 305, 307 (1988). In

rejecting the defendant's argument, the court noted that various Ohio courts of appeals had concluded that "the number of persons on the grand jury is a procedural question rather than substantive." *Id.*, citing *State v. Wilson*, 57 Ohio App.2d 11 (1st Dist.1978) and *State v. Juergens*, 55 Ohio App.2d 104 (3d Dist.1977). The Supreme Court, apparently agreeing with these courts' conclusions, held that "the number of jurors on a grand jury does not affect a substantive right." *Id.* Thus, the court concluded, because the number of grand jurors on a grand jury is a matter of procedure rather than an issue affecting a substantive right, "Crim.R. 6(A) controls the issue of how many grand jurors are needed to issue an indictment" and "R.C. 2939.02 and 2939.20 are superseded insofar as they conflict with [Crim.R. 6]." *Id.* at paragraph one of the syllabus.

{¶13} Holmes acknowledges *Brown* but argues that "*Brown* resulted in an errant result because the Ohio Supreme Court did not consider (perhaps because not argued) that no true conflict of laws exists." (Appellant's Brief at 11). She argues that the court would never have been required to reconcile Crim.R. 6(A) and R.C. 2939.02 "by reference to Article IV, Section[5](B) of the Ohio Constitution had the litigants in *Brown* * * * recognized [that] Criminal Rule 6(A) is unconstitutional and thus invalid." (*Id.*). Thus, Holmes does not appear to contest that Crim.R. 6(A) would supersede R.C. 2939.02 so long as Crim.R. 6(A) resulted from a valid exercise of the Supreme Court of Ohio's power under Article IV, Section 5(B) of

the Ohio Constitution. Instead, she argues that the Supreme Court of Ohio could not make a rule establishing the size of the grand jury because the phrase "shall be determined by law" used in Article I, Section 10 of the Ohio Constitution signifies that only the General Assembly is able to determine the number of grand jurors necessary to constitute a grand jury.

{¶14} We disagree and conclude that Crim.R. 6(A) does not run afoul of Article I, Section 10 of the Ohio Constitution. At the time of its adoption, Article I, Section 10 of the Ohio Constitution "assumed the grand jury to be an existing institution in Ohio, or, in short, recognized the grand jury as it existed at common law." *State ex rel. Doerfler v. Price*, 101 Ohio St. 50, 54 (1920). Article I, Section 10 of the Ohio Constitution simply "confer[red] a discretion on the law making body and empower[ed] it to fix the number [of persons required to constitute a grand jury] at less than twelve," the minimum number required under the common law. *Juergens* at 108. *Accord State v. Knight*, 5th Dist. Delaware No. 76-CA-19, 1977 WL 200763, *1 (May 13, 1977). That is, Article I, Section 10 of the Ohio Constitution allows that a law-making body "may change the number of persons who constitute a grand jury so that changes in that number do not involve an abridgement of [the] constitutional right" to indictment by grand jury. *Knight* at *2.

{¶15} Holmes urges us to assume that Article I, Section 10 of the Ohio Constitution contemplates that the legislature is the "law-making body" with

discretion to vary the size of the grand jury. Yet, assuming without deciding that the Ohio Constitution initially contemplated that the legislature would be the body to exercise this discretion, Holmes's argument is without merit because the adoption of Article IV, Section 5(B) of the Ohio Constitution in 1968 changed the constitutional landscape. Following the adoption of Article IV, Section 5(B), the Supreme Court of Ohio is now the principal "law-making body" tasked with crafting the laws that govern practice and procedure in the courts of this state. *See Rockey v. 84 Lumber Co.*, 66 Ohio St.3d 221, 224 (1993) ("The Civil Rules are *the law of this state* with regard to practice and procedure in our state courts.") (Emphasis added.), citing *Bishop v. Grdina*, 20 Ohio St.3d 26, 28 (1985). Therefore, Crim.R. 6(A)'s requirement that the grand jury shall consist of nine members is a "determin[ation] by law" of the number of persons necessary to constitute the grand jury within the meaning of Article I, Section 10 of the Ohio Constitution.

{¶16} However, Holmes also argues that Crim.R. 6(A) was not validly promulgated under Article IV, Section 5(B) of the Ohio Constitution because the Ohio Constitution only permits the Supreme Court to make rules governing practice and procedure in the courts of Ohio and the grand jury is not a part of any court. We disagree. "The grand jury itself is under the control and direction of the court of common pleas. * * * The grand jury is essentially an arm of the court." *State ex rel. Shoop v. Mitrovich*, 4 Ohio St.3d 220, 221 (1983), citing *State v. Schwab*, 109

Ohio St. 532 (1924); *State v. Asher*, 112 Ohio App.3d 646, 651-652 (1st Dist.1996).

*But see State ex rel. Doerfler* at 55 ("In short, the grand jury belongs to the people, to the government, and is not an adjunct of the court."). Thus, because the grand jury is more closely associated with the courts of this state than with any other branch of government, we conclude that the Supreme Court of Ohio can implement rules of procedure governing the grand jury.

{¶17} In sum, we conclude that Crim.R. 6(A) resulted from a valid exercise of the Supreme Court of Ohio's power under Article IV, Section 5(B) of the Ohio Constitution and that Crim.R. 6(A) is consistent with the dictates of Article I, Section 10 of the Ohio Constitution. Because the number of persons necessary to constitute the grand jury is a matter of procedure rather than substantive law, Crim.R. 6(A) supersedes R.C. 2939.02 to the extent that the two are in conflict. *Brown*, 38 Ohio St.3d 305, at paragraph one of the syllabus. Accordingly, the grand jury that indicted Holmes, consisting of nine grand jurors, was lawfully impaneled. As a result, the trial court did not err by denying her motion to dismiss the indictment.

{¶18} Holmes's first assignment of error is overruled.

### Assignment of Error No. II

**The Trial Court should have suppressed the fruits of a warrantless search of Mrs. Holmes' pill bottle.**

**Assignment of Error No. III**

**The Trial Court should have suppressed the fruits of a warrantless stop of Mrs. Holmes' vehicle.**

{¶19} In her second and third assignments of error, Holmes argues that the trial court erred by denying her motion to suppress evidence. Specifically, in her second assignment of error, Holmes argues that the warrantless seizure and search of a prescription pill bottle contained in her purse was unconstitutional because the pill bottle "obviously contained no marijuana," and it was not immediately apparent that the bottle contained contraband such that it could be seized and searched under the plain view exception. (Appellant's Brief at 18-21). In her third assignment of error, Holmes argues that because there was no probable cause to stop her vehicle for a violation of R.C. 4511.34, the trial court erred by concluding that the stop of her vehicle was constitutionally valid. (*Id.* at 22-23).

{¶20} "Appellate review of a motion to suppress presents a mixed question of law and fact." *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, ¶ 8. At a suppression hearing, the trial court assumes the role of trier of fact and, as such, is in the best position to evaluate the evidence and the credibility of witnesses. *Id. See State v. Carter*, 72 Ohio St.3d 545, 552 (1995). When reviewing a ruling on a motion to suppress, "an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence." *Burnside* at ¶ 8, citing *State*

*v. Fanning*, 1 Ohio St.3d 19 (1982). With respect to the trial court's conclusions of law, however, our standard of review is de novo, and we must independently determine whether the facts satisfy the applicable legal standard. *Id.*, citing *State v. McNamara*, 124 Ohio App.3d 706 (4th Dist.1997).

{¶21} The Fourth Amendment to the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures * * *." "'The primary purpose of the Fourth Amendment is to impose a standard of reasonableness upon the exercise of discretion by law enforcement officers in order to "safeguard the privacy and security of individuals against arbitrary [governmental] invasions."'" *State v. Kerr*, 3d Dist. Allen No. 1-17-01, 2017-Ohio-8516, ¶ 12, quoting *State v. Carlson*, 102 Ohio App.3d 585, 592 (9th Dist.1995), quoting *Delaware v. Prouse*, 440 U.S. 648, 99 S.Ct. 1391 (1979). "'The Fourth Amendment does not proscribe all state-initiated searches and seizures; it merely proscribes those which are unreasonable.'" *Id.*, quoting *Florida v. Jimeno*, 500 U.S. 248, 250, 111 S.Ct. 1801 (1991), citing *Illinois v. Rodriquez*, 497 U.S. 177, 110 S.Ct. 2793 (1990). "Thus, '[t]he touchstone of the Fourth Amendment is reasonableness.'" *Id.*, quoting *Jimeno* at 250.

{¶22} Because our decision with respect to Holmes's third assignment of error could affect whether we address her second assignment of error or the manner in which we would do so, we will first consider Holmes's third assignment of error,

in which she argues that the stop of her vehicle was not constitutionally permissible. "Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning" of the Fourth Amendment. *Whren v. United States*, 517 U.S. 806, 809-810, 116 S.Ct. 1769 (1996), citing *Prouse* at 653, *United States v. Martinez-Fuerte*, 428 U.S. 543, 556, 96 S.Ct. 3074 (1976), and *United States v. Brignoni-Ponce*, 422 U.S. 873, 878, 95 S.Ct. 2574 (1975). Accordingly, "[a]n automobile stop is * * * subject to the constitutional imperative that it not be 'unreasonable' under the circumstances." *Id.* at 810. An automobile stop based on probable cause that a criminal violation, including a minor traffic violation, has occurred or was occurring "is not unreasonable, and * * * an officer who makes a traffic stop based on probable cause acts in an objectively reasonable manner." *Dayton v. Erickson*, 76 Ohio St.3d 3, 11-12 (1996). In this context, "[p]robable cause 'means less than evidence which would justify condemnation,' so that only the 'probability, and not a prima facie showing of criminal activity is the standard of probable cause.'" *State v. Gonzales*, 3d Dist. Seneca Nos. 13-13-31 and 13-13-32, 2014-Ohio-557, ¶ 18, quoting *State v. George*, 45 Ohio St.3d 325, 329 (1989).

{¶23} Concerning the stop of Holmes's vehicle, the trial court found, in relevant part, as follows:

[O]n March 6, 2017 in Allen County, Ohio, State Highway Patrol Trooper Ann Malone [("Trooper Malone")] was in uniform and in a marked cruiser when the events of the traffic stop occurred.

* * *

On Interstate 75 * * * outside of Beaverdam, Trooper Malone saw a Volkswagen Jetta considered by her to be a possible rental. Malone indicated that as the Volkswagen passed her vehicle the driver did not look over but changed lanes. Malone indicated that the Jetta was one and one-half car lengths behind another vehicle, a commercial vehicle, and the approximate speed of the vehicle was 60 to 65 miles per hour.

Malone stopped the vehicle * * *.

* * *

Trooper Malone indicated that she was of the opinion that there had been a violation of Ohio Revised Code Section 4511.34, commonly known as "following too close" as [Holmes's] vehicle proceeded southbound on Interstate 75.

(Doc. No. 38).

{¶24} We conclude that competent, credible evidence supports the trial court's findings with respect to the circumstances surrounding the stop of Holmes's

vehicle. At the March 21, 2018 suppression hearing, Trooper Malone testified that while on patrol on Interstate 75 in Allen County, Ohio on the afternoon of March 6, 2017, she observed a silver Volkswagen Jetta traveling southbound in the left lane. (Mar. 21, 2018 Tr. at 11, 14-16). She stated that the vehicle aroused her suspicions because the vehicle appeared to be a rental vehicle, the driver of the vehicle did not look toward her patrol car as the vehicle passed, and the vehicle changed lanes immediately after passing her position for "no apparent reason." (*Id.* at 16-17). Trooper Malone testified that these observations prompted her to "pull[] out from the crossover to further observe the driving behavior of the Volkswagen and also run a registration check of the Volkswagen." (*Id.* at 17).

{¶25} Trooper Malone testified that by the time she caught up to the Volkswagen, it had started to rain. (*Id.*). According to Trooper Malone, once she caught up to the Volkswagen, she "noticed that the [vehicle] was traveling approximately one and a half car lengths behind a commercial vehicle in the right lane, traveling at an approximate speed [of] about sixty-five miles an hour in a seventy mile an hour zone." (*Id.*). She testified that based on the "general rule" that "for every ten mile an hour you need one car length," it was her assessment that the Volkswagen was following the commercial vehicle too closely. (*Id.* at 18). Trooper Malone said that there needed to be "at least six to seven car lengths" between the Volkswagen and the commercial vehicle. (*Id.*). She also suggested that the distance

between the Volkswagen and the commercial vehicle was inappropriate because it was raining. (*Id.*). Trooper Malone testified that, based on these observations, she then activated her overhead lights and stopped the Volkswagen. (*Id.* at 19). She identified Holmes as the driver of the Volkswagen. (*Id.* at 20-21).

{¶26} In addition to Trooper Malone's testimony concerning the stop of Holmes's vehicle, the State offered as evidence the video recording from Trooper Malone's dashboard camera. (State's Ex. 7). The recording begins as Trooper Malone's patrol vehicle pulls out from the crossover and enters the left lane of Interstate 75. (*Id.*). After approximately 40 seconds, a silver vehicle driving in the right lane comes into view. (*Id.*). Once the silver vehicle comes into view, Trooper Malone follows the vehicle for approximately 50 seconds before activating her overhead lights and effecting a stop of the vehicle. (*Id.*). The video recording depicts the silver vehicle closely following a commercial truck during the time that Trooper Malone followed the vehicle. (*Id.*). In addition, the recording reflects that in the moments preceding the stop of the silver vehicle, it was raining lightly and the windshield wipers of Trooper Malone's patrol vehicle were activated. (*Id.*).

{¶27} Therefore, competent, credible evidence supports the trial court's factual findings concerning Trooper Malone's stop of Holmes's vehicle. *See State v. Craw*, 3d Dist. Mercer No. 10-17-09, 2018-Ohio-1769, ¶ 36, citing *State v.*

*Thompson*, 7th Dist. Jefferson Nos. 98 JE 28 and 98 JE 29, 2001 WL 69197, *5-6 (Jan. 24, 2001).

{¶28} Based on these findings, the trial court concluded that the stop of Holmes's vehicle was constitutionally permissible because Trooper Malone had probable cause to stop Holmes for a violation of R.C. 4511.34. (Doc. No. 38). Specifically, the trial court noted that "[t]he testimony indicate[d] a one to one and one-half car length difference between [Holmes's] vehicle all the while [her] speed was sixty to sixty-five miles per hour as [she] trailed the commercial vehicle in front of her." (*Id.*).

{¶29} We conclude that the trial court did not err by holding that Trooper Malone had probable cause to stop Holmes's vehicle for a violation of R.C. 4511.34. R.C. 4511.34 provides in pertinent part:

> The operator of a motor vehicle, streetcar, or trackless trolley shall not
>
> follow another vehicle, streetcar, or trackless trolley more closely than
>
> is reasonable and prudent, having due regard for the speed of such
>
> vehicle, streetcar, or trackless trolley, and the traffic upon and the
>
> condition of the highway.

R.C. 4511.34(A). Although R.C. 4511.34(A) does not provide a specific standard for determining when a motorist is following another vehicle more closely than is reasonable and prudent, numerous courts have concluded that a motorist's failure to

follow another vehicle at a distance greater than one car length for every ten miles per hour the motorist's vehicle is traveling may, in some circumstances, indicate that the motorist is in violation of R.C. 4511.34. *See State v. Ward*, 4th Dist. Washington No. 10CA30, 2011-Ohio-1261, ¶ 16-17; *State v. Kelly*, 188 Ohio App.3d 842, 2010-Ohio-3560, ¶ 18-20 (12th Dist.); *State v. Stokes*, 10th Dist. Franklin No. 07AP-960, 2008-Ohio-5222, ¶ 24-25; *State v. Meza*, 6th Dist. Lucas No. L-03-1223, 2005-Ohio-1221, ¶ 19. *See also United States v. Dukes*, 257 Fed.Appx. 855, 858 (6th Cir.2007) ("The law in Ohio is clear that the car-length rule is a workable indicator of a[n] [R.C.] 4511.34 violation * * *."). However, regardless of this "car-length" standard, "[a]s is clear, the statute is couched in relative terms, and violations depend upon the circumstances of a given case." *State v. Mason-Cowan*, 10th Dist. Franklin No. 11AP-261, 2012-Ohio-1074, ¶ 7, citing *State v. Gonzalez*, 43 Ohio App.3d 59, 62 (6th Dist.1987). "An officer's direct observation that a vehicle is following another vehicle too closely provides probable cause to initiate a lawful traffic stop." *Kelly* at ¶ 15, citing *State v. Perry*, 12th Dist. Preble No. CA2004-11-016, 2005-Ohio-6041, ¶ 12.

**{¶30}** Here, the record supports the trial court's findings that Trooper Malone observed Holmes's vehicle following a commercial vehicle at a distance of less than two car lengths and that Holmes's vehicle was traveling in excess of 60 miles per hour as it trailed the commercial vehicle. Moreover, the record supports

that it was raining at the time. Given that Trooper Malone observed Holmes's vehicle following the commercial vehicle at a very close range and at a high speed while it was raining, Trooper Malone possessed enough information to determine that, when considering the speed of Holmes's vehicle and the condition of the highway, there was a sufficiently high probability that Holmes was not following the commercial vehicle at a reasonable and prudent distance. Therefore, because the stop of Holmes's vehicle was supported by probable cause, the trial court did not err by concluding that the stop was constitutionally valid.

{¶31} Having concluded that the trial court did not err by holding that probable cause supported the stop of Holmes's vehicle, we next determine whether the trial court erred by holding that the warrantless seizure and search of the prescription pill bottle was constitutional.

{¶32} Competent, credible evidence supports the trial court's findings of fact with respect to the circumstances surrounding the search of Holmes's purse and the seizure and search of the prescription pill bottle. At the March 21, 2018 suppression hearing, Trooper Malone testified that when she approached Holmes's vehicle, she detected the odor of raw marijuana. (Mar. 21, 2018 Tr. at 19-20). She testified that she was able to identify the scent of raw marijuana in part because she had received specialized training to recognize the odor. (*Id.* at 21). In addition, Trooper Malone stated that she observed marijuana residue "on the cup holder." (*Id.* at 19, 21).

Trooper Malone stated that although Holmes initially denied that she was in possession of marijuana, she eventually admitted that there was a "blunt of marijuana" in the vehicle. (*Id.* at 25-26).

{¶33} According to Trooper Malone, after her partner, Trooper Ryan Stewart ("Trooper Stewart"), arrived at the scene, the two proceeded to search Holmes's vehicle. (*Id.* at 27). Trooper Malone testified that a search of Holmes's purse "revealed a small baggy inside of a cigarillo packet, containing green leafy plant material that was later identified as marijuana." (*Id.*). She further stated that inside Holmes's purse she discovered "a prescription bottle with the name of Sharon Holmes on it with the prescription on the outside saying that is was hydrocodone/acetaminophen." (*Id.*). Trooper Malone testified that she "could clearly see through the bottle that there was a plastic baggy with multicolored pills inside of the prescription bottle, not your typical prescription pills. They were round, multicolored pink, blue and purple." (*Id.* at 28). She also testified that she did not need to open the prescription pill bottle in order to view its contents. (*Id.* at 30). Trooper Malone stated that once the pills were removed from the pill bottle, it was clear to her that the pills were not prescription pills, and she believed that the pills were ecstasy. (*Id.* at 28, 33). She testified that the pills were imprinted with images of monkeys and question marks. (*Id.* at 28).

**{¶34}** Trooper Malone then identified State's Exhibits 1-6, various photographs depicting Holmes's purse as it was first encountered, the position of the prescription pill bottle in the purse, the pill bottle as it appeared before it was opened and after it was opened, and the contents of the pill bottle once they were removed. (State's Exs. 1, 2, 3, 4, 5, 6). In particular, State's Exhibit 3 depicts the prescription pill bottle after it was removed from Holmes's purse but before it was opened. (State's Ex. 3). State's Exhibit 3 depicts that the prescription pill bottle is made of a transparent orange material. (*Id.*). The label on the pill bottle identifies Holmes as the patient for whom the prescription was written and indicates that the prescription was for 120 hydrocodone/acetaminophen tablets. (*Id.*). Furthermore, in State's Exhibit 3, a single round blue pill is visible contained inside a plastic bag which is itself enclosed within the pill bottle. (*Id.*). The plastic bag is also visible at the top of the pill bottle. (*Id.*). When discussing the State's Exhibits, Trooper Malone testified that she did not need to open the pill bottle to view its contents and that she was able to observe that the plastic bag was knotted prior to opening the pill bottle. (Mar. 21, 2018 Tr. at 30-31). She also testified that portions of the pill bottle were not covered by the label. (*Id.* at 31); (*See* State's Exs. 5, 6).

**{¶35}** Finally, Trooper Malone testified that, based on her training and experience, she knew that some people store marijuana and other illegal drugs in prescription pill bottles. (Mar. 21, 2018 Tr. at 32-33).

{¶36} Next, Trooper Stewart testified that when he arrived to assist Trooper Malone on March 6, 2017, Trooper Malone informed him that she had detected the "plain smell of marijuana" emanating from Holmes's vehicle and that they were going to conduct a probable cause search. (*Id.* at 53). Trooper Stewart testified that they then proceeded to search the vehicle, and he confirmed that during the search of Holmes's purse, they located "a cigar type wrapper bag that contained some marijuana." (*Id.*). Furthermore, Trooper Stewart stated that inside Holmes's purse, he noticed "a couple prescription pill bottles that are frequently seen to hide other contraband, other than what there [sic] intended use is for." (*Id.*). He testified that he removed the unopened pill bottles from the purse to determine whether they contained contraband. (*Id.* at 53-54). He stated that after removing the bottles from the purse, he observed "a knotted plastic bag" within one of the prescription pill bottles. (*Id.* at 54). Trooper Stewart testified that, from his experience, "knotted plastic bags are not commonly how prescriptions are administered or issued from a pharmacy" and "the pills or tablets that were within that prescription pill bottle [did not] match the description of the prescription drug that should [have] be[en] in that bottle." (*Id.*).

{¶37} Trooper Stewart then examined State's Exhibit 3 and observed that a "knotted plastic bag with some type of a tablet within that bag" was clearly visible inside the unopened pill bottle and that the visible tablet did not "match the

description of hydrocodone/acetaminophen to [his] experience." (*Id.* at 56-57); (*See* State's Ex. 3). He further testified that he was able to observe the pills and the knotted plastic bag inside the pill bottle before the bottle was opened. (Mar. 21, 2018 Tr. at 56-57). Finally, Trooper Stewart confirmed that the label on the pill bottle did not cover the entire bottle and that there was a gap between "the right and left edge of the label." (*Id.* at 57).

{¶38} On cross-examination, Trooper Stewart testified that he, rather than Trooper Malone, was the one who opened the pill bottle and removed the knotted plastic bag. (*Id.* at 58). He stated that he was looking for marijuana throughout the search of Holmes's purse and its contents. (*Id.* at 59). He testified that although he found some marijuana in the cigarillo wrapper, there could have been more marijuana in the vehicle. (*Id.*). However, Trooper Stewart conceded that he did not observe marijuana in the pill bottle when he opened it. (*Id.* at 59-60).

{¶39} Trooper Stewart reiterated that he observed a plastic bag contained within the prescription pill bottle. (*Id.* at 62). He could not recall whether he observed the distinctive imprinting on the pills from the outside of the container. (*Id.* at 62-63). He testified that his basis for opening the pill bottle was that the pills inside were inconsistent with the labeling on the pill bottle and that, based on the color and thickness of the pills, they were consistent with ecstasy tablets he had encountered in the past. (*Id.* at 63). He stated that the pills he observed in the pill

bottle were not consistent with "prescription or over the counter medication." (*Id.* at 64).

**{¶40}** On redirect-examination, Trooper Stewart testified that, based on his training and experience, he knew that people occasionally stored marijuana and other illegal drugs in prescription pill bottles. (*Id.* at 66-67). Finally, he testified that "based on the appearance [of the prescription pill bottle], the knotted bag, * * * what was available to [him] to see through the bottle itself," and his training and experience dealing with illegal street drugs, he immediately recognized that the prescription pill bottle contained contraband. (*Id.* at 68).

**{¶41}** Thus, competent, credible evidence supports the trial court's findings of fact with respect to the search of Holmes's purse and the seizure and search of the prescription pill bottle. *See Craw*, 2018-Ohio-1769, at ¶ 36, citing *Thompson*, 2001 WL 69197, at *5-6.

**{¶42}** Based on these findings, the trial court concluded that Troopers Malone and Stewart conducted a constitutionally valid search of Holmes's purse and that the pill bottle was validly seized and searched. (Doc. No. 38). First, the trial court concluded that Trooper Malone was qualified to recognize the odor of marijuana and thus the detection of the odor of raw marijuana supplied her with probable cause to search Holmes's vehicle for marijuana. (*Id.*). As to the search of

the pill bottle, the trial court concluded that "the multi-colored pills * * * [were] there to see in [Holmes's] purse * * *." (*Id.*).

**{¶43}** Initially, we note that Holmes appears to concede that the search of her vehicle generally and the search of her purse were not constitutionally suspect. (*See* Appellant's Brief at 18-21). We agree. "'A warrantless search of an automobile, where police officers have probable cause to believe such vehicle contains contraband, is one of the well-recognized exceptions to the constitutional requirement of a search warrant.'" *State v. Parsons*, 3d Dist. Henry No. 7-16-08, 2017-Ohio-1315, ¶ 24, quoting *State v. James*, 5th Dist. Muskingum No. CT2015-0059, 2016-Ohio-7660, ¶ 23. "'This "automobile exception" allows a police officer to conduct a warrantless search of portions of a motor vehicle provided he or she has probable cause to believe it contains evidence of a crime.'" *Id.*, quoting *James* at ¶ 23, citing *Carroll v. United States*, 267 U.S. 132, 158-159, 45 S.Ct. 280 (1925). *See also State v. Turner*, 2d Dist. Montgomery No. 27065, 2016-Ohio-7983, ¶ 24 ("'The police must have "probable cause" to believe that they will find the instrumentality of a crime or evidence pertaining to a crime before they begin their warrantless search.'"), quoting *State v. Kessler*, 53 Ohio St.2d 204, 208 (1978), citing *Dyke v. Taylor Implement Mfg. Co.*, 391 U.S. 216, 221, 88 S.Ct. 1472 (1968). In addition, "'[w]here police officers have probable cause to search an entire vehicle, they may conduct a warrantless search of every part of the vehicle and its

contents, including all movable containers and packages, that may logically conceal the object of the search.'" *State v. Blevins*, 3d Dist. Marion No. 9-06-40, 2007-Ohio-6972, ¶ 41, quoting *State v. Welch*, 18 Ohio St.3d 88 (1985), paragraph one of the syllabus, citing *United States v. Ross*, 456 U.S. 798, 102 S.Ct. 2157 (1982).

{¶44} Here, the trial court found and the record supports that Trooper Malone was qualified to detect the odor of raw marijuana and that she detected the odor of raw marijuana emanating from Holmes's vehicle. Trooper Malone's detection of the odor of raw marijuana, by itself, would have been sufficient to supply probable cause to search Holmes's vehicle for marijuana. *See State v. Moore*, 90 Ohio St.3d 47 (2000), paragraph one of the syllabus ("The smell of marijuana, alone, by a person qualified to recognize the odor, is sufficient to establish probable cause to conduct a search."). However, in addition to identifying the odor of raw marijuana, Trooper Malone also observed marijuana residue on the cup holder in Holmes's vehicle, and Holmes admitted that her purse contained marijuana. Accordingly, Troopers Malone and Stewart had ample probable cause to search Holmes's vehicle for marijuana. Because Troopers Malone and Stewart had probable cause to search Holmes's vehicle for marijuana, they were also permitted to search any movable container or package in Holmes's vehicle that could logically conceal marijuana. *Blevins* at ¶ 41. Holmes's purse could be, and was in fact, used to conceal marijuana, and thus, Troopers Malone and Stewart were

able to search Holmes's purse for marijuana along with any containers therein that could conceal marijuana.

**{¶45}** While Holmes does not challenge Trooper Malone's and Trooper Stewart's general authority to search her vehicle and its contents for marijuana, she argues that they lacked probable cause to search the prescription pill bottle because the "semi-clear pill bottle * * * plainly did not contain marijuana such that a search of the [pill bottle] for marijuana [was] unreasonable." (Appellant's Brief at 19). For the sake of argument, we assume without deciding that Holmes is correct that Troopers Malone and Stewart were divested of probable cause to search the pill bottle for marijuana once they removed it from her purse and observed that it contained a bag of pills, rather than raw marijuana. Nevertheless, we conclude that the seizure and search of the pill bottle were valid under the plain-view exception to the Fourth Amendment's warrant requirement.

**{¶46}** "It is well established that law enforcement officers do not need a search warrant to seize incriminating evidence discovered in a place where they have a right to be under the plain-view exception to the search-warrant requirement." *Parsons*, 2017-Ohio-1315, at ¶ 29, citing *State v. Bazrawi*, 10th Dist. Franklin No. 12AP-1043, 2013-Ohio-3015, ¶ 32, citing *Horton v. California*, 496 U.S. 128, 136, 110 S.Ct. 2301 (1990) and *State v. Williams*, 55 Ohio St.2d 82, 84 (1978). "Under 'the plain-view exception, "police may seize evidence in plain view

during a lawful search if: (1) the seizing officer is lawfully present at the place from which the evidence can be plainly viewed; (2) the seizing officer has a right of access to the object itself; and (3) the object's incriminating character is immediately apparent."'" *Id.*, quoting *Bazrawi* at ¶ 32, quoting *State v. Alihassan*, 10th Dist. Franklin No. 11AP-578, 2012-Ohio-825, ¶ 11, citing *Horton* at 136-137. "The 'immediately apparent' requirement of the 'plain view' doctrine is satisfied when police have probable cause to associate an object with criminal activity." *State v. Halczyszak*, 25 Ohio St.3d 301 (1986), paragraph three of the syllabus. "In ascertaining the required probable cause to satisfy the 'immediately apparent' requirement, police officers may rely on their specialized knowledge, training and experience." *Id.* at paragraph four of the syllabus.

**{¶47}** Holmes admits that the seizure and search of the pill bottle would be valid so long as the contents of the pill bottle "were essentially contraband in plain sight." (Appellant's Brief at 20). However, she argues that the contents of the pill bottle were not "essentially contraband in plain sight" because "the only observation was that the pills were multi-colored" and "[m]ulti-colored pills are not obviously contraband." (*Id.* at 19-20).

**{¶48}** Holmes's argument is without merit. As discussed above, Troopers Malone and Stewart were lawfully present in Holmes's vehicle pursuant to their probable cause search for marijuana. In addition, as part of this search, they were

lawfully permitted to enter Holmes's purse. Furthermore, in searching Holmes's purse, Troopers Malone and Stewart had the authority to remove any containers enclosed therein that could conceal marijuana and search any such containers for marijuana. Troopers Malone and Stewart were permitted to remove the prescription pill bottle containing the multicolored pills from Holmes's purse, which brought the contents of the transparent bottle into plain view. Therefore, Troopers Malone and Stewart also had a right of access to the pill bottle itself. Consequently, the first and second prongs of the plain-view exception are satisfied.

{¶49} The third prong of the plain-view exception is also met. Contrary to Holmes's argument that "the only observation was that the pills were multi-colored," Trooper Stewart, who ultimately searched the seized pill bottle, testified to numerous additional factors demonstrating that the incriminating character of the contents of the pill bottle was immediately apparent. Trooper Stewart testified that, based on his training and experience, pharmacies do not dispense prescription medications in knotted plastic bags and that the pills inside the plastic bag did not match the description of the prescription drug listed on the pill bottle's label. (Mar. 21, 2018 Tr. at 54, 56-57). He also testified that, based on the color and thickness of the pills, the pills were similar to ecstasy tablets he had encountered in the past and inconsistent with prescription or over the counter medications. (*Id.* at 63-64).

Finally, Trooper Stewart testified that based on all of these factors, he immediately recognized that the prescription pill bottle contained contraband. (*Id.* at 68).

**{¶50}** Trooper Stewart was entitled to rely on his specialized knowledge, training, and experience in determining whether there was probable cause to believe that the pill bottle contained contraband. *Halczyszak*, 25 Ohio St.3d 301, at paragraph four of the syllabus. Relying on his training and experience, Trooper Stewart arrived at the reasonable conclusion that there was probable cause to believe that the pill bottle contained an illegal substance. *Id.* at paragraph three of the syllabus. The record supports Trooper Stewart's determination. Therefore, we conclude that the incriminating character of the pill bottle's contents was immediately apparent. Consequently, Trooper Stewart was justified in seizing the pill bottle and its contents under the plain-view exception.

**{¶51}** The applicability of the plain-view exception to the facts of this case is not affected by the fact that Trooper Stewart needed to open the pill bottle to secure the bag of pills instead of seizing the bag of pills directly. Typically, "[i]n cases involving closed containers, * * * the plain view doctrine may support the warrantless *seizure* of a container believed to contain contraband but any subsequent *search* of the concealed contents of the container must be accompanied by a warrant or justified by one of the exceptions to the warrant requirement." (Emphasis sic.) *United States v. Corral*, 970 F.2d 719, 725 (10th Cir.1992), citing

*Texas v. Brown*, 460 U.S. 730, 749-751, 103 S.Ct. 1535 (1983) (Stevens, J., concurring) and *Horton*, 496 U.S. at 141, fn. 11.  However, "when a container is 'not closed,' or 'transparent,' or when its 'distinctive configuration * * * proclaims its contents,' the container supports no reasonable expectation of privacy and the contents can be said to be in plain view." *United States v. Donnes*, 947 F.2d 1430, 1437 (10th Cir.1991), quoting *Robbins v. California*, 453 U.S. 420, 427, 101 S.Ct. 2841 (1981), *overruled on other grounds*, *United States v. Ross*, 456 U.S. 798, 102 S.Ct. 2157 (1982), and *Arkansas v. Sanders*, 442 U.S. 753, 764, 99 S.Ct. 2586 (1979), fn. 13, *abrogated on other grounds*, *California v. Acevedo*, 500 U.S. 565, 111 S.Ct. 1982 (1991).  Hence, "where the contents of a seized container are a foregone conclusion, [the] prohibition against warrantless searches of containers under the plain view doctrine does not apply." *Corral* at 725.

{¶52} Here, Holmes's prescription pill bottle was made of a transparent material and a portion of the bottle was not covered by the label.  As a result, Trooper Stewart was able to see into the bottle and determine that it likely contained contraband without needing to open it.  Accordingly, the contents of the pill bottle were effectively in plain view, and Holmes did not have any reasonable expectation of privacy in the container that would have prevented Trooper Stewart from opening and searching the bottle.

-31-

{¶53} In conclusion, the trial court did not err by holding that Trooper Malone had probable cause to stop Holmes's vehicle and that the seizure and search of Holmes's prescription pill bottle was valid under the plain-view exception. Thus, the trial court did not err by denying Holmes's motion to suppress evidence. Accordingly, Holmes's second and third assignments of error are overruled.

### Assignment of Error No. IV

**The Trial Court denied due process and the effective assistance of counsel by refusing to allow fair cross-examination of the State witness.**

{¶54} In her fourth assignment of error, Holmes argues that the trial court erred by limiting her ability to cross-examine Trooper Malone at the suppression hearing. Specifically, Holmes suggests that Trooper Malone testified that there are exceptions to the car-length standard. (Appellant's Brief at 23). Holmes argues that "Trooper Malone never explained when the exceptions apply because defense counsel was not allowed to cross examine the witness as to the exceptions * * *." (*Id.*). Furthermore, Holmes argues that the trial court should have permitted her to cross-examine Trooper Malone further concerning Trooper Malone's claim that she learned about the car-length standard during her training to become a highway patrol trooper. (*Id.*). Holmes insists that additional cross-examination of Trooper Malone on this subject would have revealed that Trooper Malone was not actually trained on the car-length standard.

**{¶55}** Evid.R. 611, which governs trial courts' authority to control the mode and order of cross-examination, provides:

(A) Control by Court. The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment.

(B) Scope of Cross-Examination. Cross-examination shall be permitted on all relevant matters and matters affecting credibility.

Evid.R. 611(A), (B). "Trial judges may impose reasonable limits on cross-examination based on a variety of concerns, such as harassment, prejudice, confusion of the issues, the witness's safety, repetitive testimony, or marginally relevant interrogation." *State v. Treesh*, 90 Ohio St.3d 460, 480-481 (2001), citing *Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S.Ct. 1431 (1986). "'The limitation of * * * cross-examination lies within the sound discretion of the trial court, viewed in relation to the particular facts of the case.'" *State v. Ollison*, 10th Dist. Franklin No. 16AP-95, 2016-Ohio-8269, ¶ 59, quoting *State v. Acre*, 6 Ohio St.3d 140, 145 (1983). Thus, "[s]uch exercise of discretion will not be disturbed in the absence of a clear showing of an abuse of discretion." *Acre* at 145. An abuse

of discretion is more than a mere error in judgment; it suggests that a decision is unreasonable, arbitrary, or unconscionable. *State v. Adams*, 62 Ohio St.2d 151, 157-158 (1980).

{¶56} We conclude that the trial court did not abuse its discretion by limiting Holmes's ability to cross-examine Trooper Malone about exceptions to the car-length standard. Trooper Malone's knowledge about possible exceptions to the car-length standard was, at best, marginally relevant. Trooper Malone was a fact witness at the suppression hearing. Her testimony related to the observations that she made on the afternoon of March 6, 2017, the actions she took in response to those observations, and why those observations prompted her to act in the manner that she did. In contrast, it was the trial court's responsibility to determine whether there was probable cause to stop Holmes's vehicle for violating R.C. 4511.34 based on the facts as related by Trooper Malone. Whether violating the car-length standard supports probable cause to stop a vehicle for violating R.C. 4511.34 and whether there are any exceptions to the car-length standard that would negate probable cause are questions of law for the trial court to resolve. From the record, we cannot conclude that Trooper Malone possesses any particular expertise on these questions of law, aside from some training that the car-length standard is a workable indicator of an R.C. 4511.34 violation. Thus, Trooper Malone's knowledge of or opinion about exceptions to the car-length standard and when they apply would have

had little relevance to the trial court's determination of whether probable cause existed to stop Holmes's vehicle.

{¶57} In addition, the trial court did not abuse its discretion by limiting Holmes's ability to cross-examine Trooper Malone regarding her basis for knowledge of the car-length standard. During cross-examination, Trooper Malone testified repeatedly that through her training and experience, she had learned that the car-length standard could be used to evaluate probable cause to stop a vehicle for an R.C. 4511.34 violation. (Mar. 21, 2018 Tr. at 38, 45). Holmes's trial counsel questioned Trooper Malone about the source of that standard, specifically whether Trooper Malone knew if the statute provided that standard. (*Id.* at 38-40, 45-46). Throughout cross-examination, Trooper Malone steadfastly insisted that the car-length standard was the standard she was taught to apply. Ultimately, further cross-examination on Trooper Malone's basis for knowledge of the car-length standard would likely have produced only repetitive testimony, and thus, the trial court did not abuse its discretion by stopping further cross-examination on the subject.

{¶58} Holmes's fourth assignment of error is overruled.

{¶59} Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

*** Judgment Affirmed ***

**ZIMMERMAN, P.J. and SHAW, J., concur.**