[Cite as *State v. Johnson*, 2023-Ohio-2979.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY


State of Ohio                                    Court of Appeals No.  L-22-1306

      Appellee                         Trial Court No.  CR0202101505

v.

Trollis Johnson                          **DECISION AND JUDGMENT**

      Appellant                       Decided:  August 25, 2023

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Brenda J Majdalani, Assistant Prosecuting Attorney, for appellee.

Samuel Z. Kaplan, for appellant.

* * * * *

**DUHART, J.**

{¶ 1} Appellant, Trollis Johnson, appeals from the judgment of the Lucas County

Court of Common Pleas, denying his motion to suppress evidence obtained from a

warrantless traffic stop.  For the reasons that follow, the trial court's judgment is

affirmed.

## Statement of the Case

{¶ 2} Johnson and his co-defendant, Ronvellchio T. Harris, were charged by indictment on April 8, 2021, for offenses committed on or about April 18, 2020. Counts one and two relate to Johnson, and counts three and four relate to Harris. Count one charged Johnson with trafficking in cocaine in violation of R.C. 2925.03(A)(2) and (C)(4)(f), a felony of the first degree; count two charged him with possession of cocaine in violation of R.C. 2925.11(A) and (C)(4)(e), also a felony of the first degree.

{¶ 3} On October 12, 2021, Johnson filed a motion to suppress evidence. The trial court held on the matter, and, on April 28, 2022, issued an opinion and judgment entry denying Johnson's motion.

{¶ 4} Following a period of negotiation, Johnson entered a plea of no contest to a lesser included offense of count two, possession of cocaine in violation of R.C. 2925.11(C)(4)(d), a felony of the second degree. Johnson's sentencing hearing took place on December 1, 2022.

{¶ 5} At sentencing, Johnson was sentenced to serve a minimum prison term of two years and a maximum indefinite prison term of three years. A nolle prosequi was entered as to count 1.

## Statement of Facts

{¶ 6} In late March or early April 2020, Detective David Donovan of the Toledo Police Department began an investigation of possible drug trafficking involving Johnson

2.

and Harris. The investigation was based on information that Donovan had received from a confidential informant ("CI"). According to the CI, Harris would travel to obtain drugs from Johnson, who lived out of state.

{¶ 7} Surveillance was conducted, and from that surveillance Donovan was able to verify certain information that was provided by the CI. Specifically, police observed Harris traveling throughout the city of Toledo, meeting with various individuals and engaging in what appeared to be hand-to-hand transactions consistent with drug trafficking behavior.

{¶ 8} The CI further indicated that Harris used a rental car when traveling out of town, and that he would be traveling to South Carolina in a matter of days. As Harris was moving about the city conducting his transactions, police observed him operating a rented navy blue Toyota.

{¶ 9} Donvovan obtained a search warrant permitting him to affix a GPS tracking device to Harris's rental vehicle. Within 24 hours, Toledo Police observed Harris using the car to travel out of town. Rather than going to South Carolina, however, the vehicle went to the state of Texas.

{¶ 10} Toledo police contacted Texas law enforcement, who verified that the rental vehicle was in Texas, at an address associated with Johnson. Later, the GPS tracking device indicated that the vehicle was headed back to Ohio. Toledo police contacted the Ohio State Highway Patrol Drug Interdiction Unit (OSHP) for assistance.

3.

Donovan testified that the OSHP is frequently asked to assist in highway drug interdiction cases, as this is their area of expertise. While Toledo Police kept OSHP advised as to the vehicle's location, ultimately it was up to OSHP to decide whether or not they had probable cause to stop the vehicle.

{¶ 11} On April 18, 2020, Trooper Jason Archer, who was part of the OSHP K9 unit, was dispatched to U.S. Highway 24 to watch for the blue Toyota. Archer was positioned in the highway median. At approximately 3:00 p.m., Archer observed a navy blue Toyota Camry drive past him in the right hand lane. The left hand lane was open and -- as indicated by Archer's dash camera video -- the Toyota was traveling immediately behind a commercial semi-trailer. Archer pulled out and deployed his laser gun and determined that the Toyota was traveling at 68 miles per hour – which was within the posted speed limit. Archer testified that he observed the Toyota traveling behind the semi-trailer, on this dry and cloudy day, at a distance of between two and three car lengths. Based upon his observations of the amount of distance between the trailer and the Toyota and the Toyota's speed of travel, Archer initiated a traffic stop for following too closely in violation of R.C. 4511.34.

{¶ 12} Archer testified at length during the suppression hearing as to how he would determine whether a vehicle was following another too closely. He stated:

4.

Rule of thumb would be one car length for 10 miles an hour. But to take it a step further, there is a mathematical calculation that you can determine the perception/reaction time and the braking/stopping distance.

According to Archer, the calculation -- learned as part of his training in crash reconstruction -- takes into account vehicle speed and drag, together with driver reaction time. Using this calculation, Archer determined that a vehicle traveling 68 miles per hour moves at a rate of 99.688 feet per second. He further testified that the average reaction time to a perceived threat is 1.5 seconds, so that by the time someone going 68 miles per hour is able to react to a threat, they have already traveled 149.53 feet. As for braking distance -- apart from the matter of reaction time -- Archer calculated that it would take a vehicle traveling 68 miles per hour 214.074 feet to stop. Adding the reaction-time distance to the actual braking distance, Archer calculated that 363.604 feet of total braking distance would have been needed to stop Johnson's vehicle. Finally, Archer testified that Harris's rental vehicle was 16.08 feet in length, and that three times this length -- which was the approximate distance separating the rental vehicle from the truck in front of it -- was "nowhere near the amount of distance required to stop effectively to avoid a potential crash or maneuver to avoid whatever is in the roadway."

{¶ 13} According to Archer, this calculation is not done while on the road; instead, when he is on the road, he has to make estimations based on what he sees in front of him and in registering the vehicle's speed.

5.

{¶ 14} The trial court, in its April 28, 2022 opinion and judgment entry, expressly accepted Archer's calculations and testimony regarding speed and braking distance. After considering that evidence together with Archer's dash cam video evidence, the trial court concluded that "there was probable cause that a violation of R.C. 4511.34 had occurred."

## Assignment of Error

{¶ 15} Johnson asserts the following assignment of error on appeal:

I. The trial court erred in denying appellant Trollis Johnson's motion to suppress in violation of the Fourth and Fourteenth Amendments to the United States Constitution and Article I, Section 14 of the Ohio Constitution.

## Analysis

{¶ 16} Johnson's sole assignment of error asserts that the trial court erred in denying his motion to suppress evidence obtained from the traffic stop. Appellate review of a motion to suppress presents a mixed question of law and fact. *State v. Burnside*, 100 Ohio St,3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. When the trial court considers a motion to suppress, it acts as the factfinder and is in the best position to resolve factual questions and to evaluate the credibility of witnesses. *Id.* Thus, an appellate court must accept the trial courts findings of fact if they are supported by competent, credible evidence. *Id.* This court must then determine, without deference to the trial court's

conclusion, whether the facts satisfy the applicable legal standard. *Id.* The trial court's application of law is reviewed de novo. *State v. Williams*, 6th Dist. Erie No. E-18-024, 2019-Ohio-5144, ¶ 11.

{¶ 17} "The Fourth Amendment to the United States Constitution and Section 14, Article I of the Ohio Constitution guarantee the right to be free from unreasonable searches and seizures." *State v. Mays*, 119 Ohio St.3d 406, 2008-Ohio-4539, 894 N.E.2d 1204, ¶ 7, citing *State v. Orr*, 91 Ohio St.3d 389, 391, 745 N.E.2d 1036 (2001). "'A traffic stop for a suspected violation is a 'seizure' of the occupants of the vehicle and therefore must be conducted in accordance with the Fourth Amendment.'" *State v. Martorana*, 6th Dist. Sandusky No. S-22-011, 2023-Ohio-662, ¶ 20, quoting *Helen v. North Carolina*, 574 U.S. 54, 60, 135 S.Ct. 530, 190 L.Ed.2d 475 (2014). "This type of seizure is justified if an officer has a 'reasonable suspicion' – i.e., 'a particularized and objective basis' to suspect – that the person stopped has broken the law." *Martorana* at ¶ 20, citing *Helen* at 60. "In other words, a traffic stop is constitutionally valid if an officer has a reasonable and articulable suspicion that a motorist has committed a traffic violation." *Martorana* at ¶ 20, citing *Mays* at ¶ 7-8.

{¶ 18} "When analyzing suppression arguments challenging the propriety of investigative stops, we view the totality of the circumstances '"through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training."'" *State v. Johnson*, 6th Dist. Wood No. WD-21-070, 2023-Ohio-30, ¶ 31. In

making this analysis, a reviewing court "need not concern [itself] with the degree of violation or whether * * * the statute 'is honored far more in the breach than in the keeping.'" *State v. Stokes*, 10th Dist. Franklin No. 07AP-960, 2008-Ohio-5222, ¶ 36. That is, the fact that a violation may be extremely minor and/or commonly committed is of no consequence in terms of our examination.

{¶ 19} The question of whether a defendant might have a defense to a charge of committing a traffic violation is likewise irrelevant to our analysis of whether an officer has a reasonable and articulable suspicion to initiate a traffic stop. *Mays* at ¶ 17. Thus, "[a]n officer is not required to determine whether someone who has been observed committing a crime might have a legal defense to the charge." *Id.* Even if an officer is mistaken that a defendant violated the law -- that is, where the evidence would be insufficient to prove the elements of the relevant statute beyond a reasonable doubt -- as long as the officer had an objectively reasonable belief that a traffic violation occurred, the traffic stop is justified and proper. *State v. McDonald*, 8th Dist. Cuyahoga No. 111724, 2023-Ohio-464, ¶ 27-28, citing *State v. Spellacy*, 2010-Ohio785, 132 N.E.3d 1244, ¶ 31 (8th Dist.) (holding that even if a defendant's "two momentary flickers of his high-beam headlights spanning 14 seconds apart were not sufficient to constitute a violation of [the law]," the traffic stop was still lawful if the officer reasonably, albeit mistakenly, believed that a violation of the law had occurred).

8.

**{¶ 20}** In the instant case, Archer stopped the rental vehicle for a violation of R.C. 4511.34, which provides in pertinent part:

(A) The operator of a motor vehicle, streetcar, or trackless trolley shall not follow another vehicle, streetcar, or trackless trolley more closely than is reasonable and prudent, having due regard for the speed of such vehicle, streetcar, or trackless trolley, and the traffic upon and the condition of the highway.

**{¶ 21}** This court recognized in *State v. Gonzalez*, 43 Ohio App.3d 59, 61, 539 N.E.2d 641 (6th Dist.1987), that the purpose of the "reasonable and prudent" standard is "to prevent rear-end collisions." "Whether a person could stop in time to avoid a rear-end collision is thus the important issue." *Id.*

**{¶ 22}** Archer testified that he observed the rental vehicle traveling at 68 miles per hour, and that the approximately 16-foot rental vehicle was only two to three car lengths, or less than 50 feet, behind the semi-trailer in front of it. This, despite the fact that the left lane was wide open and available for use. Using a calculation learned as part of his crash reconstruction training, the trooper explained that, even on a dry day, there should have been no less than 363.604 feet between the vehicles. Thus, at appellant's speed, the rental vehicle should have been approximately 23 car lengths behind the truck. The evidence adduced at the hearing supports the conclusion that Archer possessed at least reasonable suspicion that that the vehicle was driven in violation of R.C. 4511.34.

9.

**{¶ 23}** Johnson argues against this conclusion, stating that the trial court's findings were not supported by competent, credible evidence. First, Johnson cites the "disingenuous nature" of testimony by Archer. Specifically, Johnson points to testimony by Archer that Archer decided to clock the speed of Harris's rental car in response to this court's decision in *State v. Bui*, 6th Dist. Lucas No. L-19-1028, 2021-Ohio-362, a case that had not yet been decided at the time Archer effected the traffic stop in this case.[1] The trial court recognized this discrepancy in its April 28, 2022 opinion and judgment entry, but stated "there is no dispute between the parties that Trooper Archer did in fact clock the Defendant's speed." We agree that a discrepancy exists as to *why* Archer decided to clock the driver's speed in this case, but such is not sufficient to discredit the remainder of Archer's testimony. Importantly, the discrepancy does nothing to put into doubt: (1) the fact that the rental car was traveling at 68 miles per hour; or (2) the validity of Archer's dash cam video evidence, which showed the rental car following closely behind the semi-trailer; or (3) the validity of Archer's calculations.

**{¶ 24}** Johnson also criticizes the fact that Archer drew up the worksheet containing his calculations immediately before trial, and not on the spot at the scene of the violation. As noted by the trial court:

---

[1] In *Bui*, this court criticized the fact that Archer "estimated the [defendant's] speed at roughly or approximately 65 m.p.h., but provided no explanation as to how he arrived at that speed."

10.

This equation would not have been done at the scene. It was explained that when making the stop the standard is ingrained in [Archer's] head and that he must trust what he sees on the road. He had the video available to him so he could time how many seconds the car was behind the truck. He used radar to ascertain the exact speed. Defendant argues that it was not done until 366 days after the stop. That has no bearing here, because the calculations would always have to be after the stop. An officer must rely on his observations that day or never be able to stop anyone for following too closely.

We agree that evidence of Archer's after-the-fact calculation merely -- and properly -- supports his earlier, spur-of-the-moment, determination that the rental vehicle was following the semi-trailer too closely.

{¶ 25} Next, Johnson criticizes the fact that Archer's reaction time figure was based on an average reaction time, and average brake and braking conditions, rather than those specifically at issue in this case. This type of challenge, suggesting the relevancy of factors outside the norm, would seem to be in the nature of a defense to the charge of following too closely, unrelated to the question of whether Archer had reasonable, articulable suspicion to make the stop in the first place. As indicated above, whether a defendant has a defense to a charge of committing a traffic violation is irrelevant to our

analysis of whether Archer had an objectively reasonable belief that a traffic violation occurred.

{¶ 26} Johnson also takes issue with the fact that this was clearly a pretextual stop. However, the Supreme Court of Ohio has held that pretextual stops are "not unreasonable under the Fourth Amendment, so long as a police officer has probable cause to believe a traffic violation has occurred, even if the officer's motivation is based on suspicion that the motorist is engaging in other criminal activity." *Bui* at ¶ 17, citing *Dayton v. Erickson*, 76 Ohio St.3d 3, 665 N.E.2d 1091 (1966), syllabus. As in this case, "'[a]n officer's direct observation that a vehicle is following another too closely provides probable cause to initiate a lawful traffic stop.'" *State v. Holmes*, 2019-Ohio-2485, 139 N.E.3d 574, ¶ 29 (2019), citing *State v. Kelly*, 188 Ohio App.3d 842, 2010-Ohio-3560, 937 N.E.2d 149, ¶ 15 (12th Dist.).

{¶ 27} Next, Johnson argues that the rental vehicle was behind the semi-trailer for a matter of 55 seconds or less before moving into the left lane and, therefore, the evidence was insufficient to establish a violation of R.C. 4511.34. Unfortunately for Johnson, although the violation was, in fact, exceptionally slight, the degree of violation is irrelevant to our analysis and, therefore, does not alter our conclusion in this case.

{¶ 28} For all of the foregoing reasons, appellant's assignment of error is found not well-taken.

12.

**Conclusion**

**{¶ 29}** Because the trial court properly found that the traffic stop did not violate Johnson's constitutional rights, and properly denied Johnson's motion to suppress based upon the validity of the traffic stop, the judgment of the Lucas County Court of Common Pleas is affirmed. Appellant is to pay the costs of appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Christine E. Mayle, J.                _____
                                                  JUDGE

Myron C. Duhart, P.J.          

                                        _____

Charles E. Sulek, J.                                          JUDGE
CONCUR.

                                        _____
                                                  JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.

14.